No. 38,449

NORTHERN NATURAL GAS COMPANY, *Appellee*, v. REPUBLIC NATURAL GAS COMPANY, *Appellant*.

(241 P. 2d 708)

filed March 8, 1952.

Opinion

*George Siefkin,* of Wichita, argued the cause, and *George B. Powers, Samuel E. Bartlett, Carl T. Smith, John F. Eberhardt, Stuart R. Carter,* and *Robert C. Foulston,* all of Wichita, were with him on the briefs for the appellant.

*Mark H. Adams,* of Wichita, argued the cause, and *Lawrence I. Shaw, E. M. Petersen,* and *F. V. Roach,* all of Omaha, Nebraska, and *Charles E. Jones, William I. Robinson, J. Ashford Manka,* and *Orval L. Fisher,* all of Wichita, and *Auburn Light,* of Liberal, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: Plaintiff brought this action under our declaratory judgment statute (G. S. 1949, 60-3127 *et seq.*) seeking a binding adjudication and consequential relief respecting a contract between the parties. Defendant answered denying the interpretation of the contract alleged by plaintiff and that plaintiff was entitled to the relief sought, and prayed that the action be dismissed. It also filed a cross petition for a money judgment, and issues were joined upon the cross petition. A trial by the court resulted in judgment for plaintiff and defendant has appealed.

Plaintiff, hereinafter referred to as Northern, is a corporation organized under the laws of Delaware and authorized to do business in Kansas. It is a Natural Gas Company, as that term is defined in the Act of Congress called the Natural Gas Act, 15 U. S. C. A. 717. Its business is to purchase or produce natural gas in one or more states and convey the same into other states for distribution and sale to ultimate consumers. Its pipe lines begin in the gas fields of Texas, extend north through the Hugoton gas fields in Kansas, and north into Nebraska and eastward to Omaha and to areas north and east of Omaha.

Defendant, hereinafter called Republic, is a corporation organized under the laws of Delaware and authorized to do business in Kansas and is a gas producing company. The sole business of Republic is to produce gas which it sells to Northern. They commenced business about the same time in 1930, Republic producing gas which it sold and delivered to Northern. In 1930 a contract was entered into between the two companies with those purposes in view. We are not concerned here with that contract. It is mentioned only as a part of the history of the dealings of the parties. It was modified from time to time, and under date of December 21, 1945, the parties executed the contract here involved. From the experiences of the parties this contract was designed to cover everything of importance with respect to their dealings. The part of it

which appellant thought this court ought to have before it is set out as Appendix "A" to this opinion.

We are concerned here primarily with the business of the parties through the fiscal year from July 1, 1947, to June 30, 1948. The trial was held before the Hon. H. W. Stubbs, a member of the bar of this court, sitting as judge pro tem, selected because of his extensive practice in the law of oil and gas. The trial was held in June, 1950, when parol testimony and documentary evidence were received in evidence. Counsel requested findings of fact and conclusions of law and desired to present briefs, which they did later. Thereafter the court filed a memorandum opinion together with findings of fact and conclusions of law. These so thoroughly treat every feature of the case that we think it pertinent to copy or summarize them quite fully, as follows:

"Memorandum Opinion

"During the past weeks I have devoted considerable time to a study of the transcript, the exhibits, the briefs of counsel and their requested findings of fact and conclusions of law, and have noted a surprising lack of conflict in the briefs and in the requested findings of fact. This lack of conflict was also very much in evidence at the trial.

"I have again reversed myself on the matter of the duty of Republic to tender gas to Northern. This is peculiarly a contract which requires the greatest co-operation between the buyer and seller, and as is stated in one or more of the findings, Republic's duty under the contract consists in part of delivering gas to Northern as Northern requires it, and to deliver large volumes of gas during the summer months when Northern's requirements are comparatively light would, in my opinion, constitute a violation of the spirit of the contract, and if insisted upon by Republic might even constitute a breach thereof; and I have therefore reached the conclusion that it is Northern's duty to advise Republic of the amounts of gas required from day to day or from month to month, and Republic's duty to put that amount of gas at the disposal of Northern, and it is primarily Northern's obligation to see that the aggregate of the takes specified by it during the contract year at least equals the minimum amount of gas which Republic is entitled to furnish during that year.

"In my construction of this contract I have imposed upon Republic the obligation to comply with the spirit of the Basic Order applicable to the Hugoton field. In my opinion the production of a well, or series of wells, continuously to a point approximating but barely under three times the current allowable is not sanctioned by this order. The order requires that the wells be produced within the limits of the current allowable but certain violations are permitted by reason of the impossibility of producing the exact amount allowed and by reason of the fluctuations required by seasonal changes and the limit of such overproduction is specified as being three times the current allowable, at which time the well must be shut in.

"It is further my opinion that Republic's insistence during the contract year in question, of producing these wells to a point where by the end of that year

the group as a whole would barely escape being shut in and early in the next contract year a large number of wells must inevitably have been shut in, was not only in violation of the spirit of this order, but also in violation of that provision of the contract which provides that the wells should be kept in good condition to produce continuously and without interruption the requirements of the buyer. The wisdom of the parties in restricting the production of the wells during the contract year in question has been justified. It is observed from the record that prior to the commencement of the contract year in question there was no friction whatever between representatives of Northern and Republic. Approximately the minimum of 60% of the requirements of Northern's Omaha District was at all times furnished prior to the commencement of the contract year in question; and it is a fair inference, from the record, if it does not so definitely appear, that for the entire period of time subsequent to the end of the contract year in question, approximately the full current allowable of Republic's wells have been produced and delivered to Northern. Had the billion and a half feet of gas contended for by Republic been produced during the contract year in question the state of confusion existing during that year must necessarily have continued to the present time; and the conclusion is inevitable that the restriction of these wells during that contract year has enabled the parties to carry out the terms of the contract amicably and without confusion and without the necessity of argument as to what the several provisions of the contract really mean.

"As previously stated, the requested findings of fact by the respective parties showed a remarkable lack of conflict. Most of the findings requested by each party could have been allowed by the court, but this would have resulted in duplication and would have prolonged the record unnecessarily. I have therefore allowed some of these findings in part, some of them in their entirety, and have also combined certain findings requested by plaintiff and defendant.

"The requested Findings and Conclusions of Law, including the interpretation of the contract, are hereto attached. . . .

"FINDINGS OF FACT

"No. 1. Plaintiff is in the business of transporting natural gas by pipe line for sale to communities in Kansas, Nebraska, Iowa, Minnesota and South Dakota. During the period in controversy it also owned and operated its own gas wells in the Hugoton Gas Field located in the State of Kansas. In addition, it purchased gas from producers, including the defendant.

"Defendant is a producer of natural gas, and during the period in controversy owned and operated 125 to 135 gas wells in Stevens and Morton Counties, Kansas, which counties are located in the Kansas portion of the Hugoton gas field. Defendant's wells are connected together with a 14-inch loop line which constitutes what is known as its gathering system. Pipe lines comprising such system are in excess of 60 miles in length. The 14-inch loop lines of the defendant connects with plaintiff's pipe line system in the Northwest Quarter of Section 19, Township 33 South, Range 36 West, Stevens County, Kansas. That location is the point at which the gas of the defendant is delivered to the plaintiff.

"2. That on December 21, 1945, Republic and Northern entered into a Gas Purchase Contract, which for convenience will be hereafter referred to as 'Con-

tract'; that generally under the terms thereof Republic agreed to develop approximately 75,000 acres of land therein described in Stevens and Morton Counties, Kansas (or substitutions or additions thereto) for the production of gas, to gather such gas through its own gathering system and to deliver the same to Northern at a point in the NW¼ of Section 19, Township 33 South, Range 36 West of the 6th P. M., in Stevens County, Kansas, where the gathering facilities of Republic interconnect with the pipeline system of Northern, such delivery to be at the highest pressure which could be efficiently maintained by the natural pressure of gas from the wells connected to Republic's gathering system. (Art. V, Sections 1 & 3, Contract); that such parties agreed that Republic's gathering system should be so designed and at all times maintained as to deliver gas to Northern through pipelines of ample size to conform to good practice so that the pressure drops through said lines from Republic's wells to the point of delivery to Northern should be as small as practicable (Art. V, Sec. 2, Contract); that the quantity of gas which Northern agreed to purchase and receive from Republic and Republic agreed to sell and deliver to Northern by said contract was 60% of the daily requirements of Northern for serving its pipeline, and any extension thereof, for the 'Omaha District' as in the contract defined, it being agreed that in any contract year, beginning on July 1st of each year, the aggregate volume of gas to be purchased by Northern and delivered by Republic should not be less than 12,500,000,000 cubic feet nor more than 36,500,000,000 cubic feet, Republic never being obligated to deliver more than 100,000,000 cubic feet of gas during any twenty-four hour period (Art. 1, Secs. 2, 3 & 4, Contract); That Republic in such contract agreed that it would at all times maintain its gas wells in good condition and use its best endeavors to maintain a supply of gas adequate to meet Northern's aforesaid daily requirements and to deliver, so far as practicable, and without interruption, to Northern, gas in accordance with Northern's market demands in said 'Omaha District' (Art. I, Sec. 4; Art. VIII, Sec. 1, pps. 17-18, Contract).

"During the effective period of the contract all of the gas rights possessed by Republic in the lands described in the contract and the gathering system of Republic were to be exclusively devoted to the fulfillment of the contract. Republic agreed that it would not sell gas produced from any of the specified acreage to any party other than Northern or use its gathering system in connection with the sale and delivery of gas to any party other than Northern. (Ex. 6, pp. 11-16, Art. VI). Northern was granted the option of installing its own meters on the gas wells of Republic and was granted the right of ingress to and egress from said meters if located on Republic's property. (Sec. 4, Art. III, Ex. 6). The price to be paid for all gas delivered (Art. III), its method of measurement (Art. III), quality (Art. IV), delivery pressure and point of delivery (Art. V), and a warranty of title by Republic to the gas sold (Art. IX) were also included in the contract. The volume of gas to be purchased and sold was set forth in the contract as follows:

'The quantity of gas which Northern agrees to purchase and receive from Republic and Republic agrees to sell and deliver to Northern shall be sixty per centum (60%) of all gas which Northern may take or use, or cause to be taken or used, during the term of this contract, for the requirements of

Northern for serving from its said pipe line and any extension thereof which Northern may make, all or any portion of that part of the States of Iowa and Nebraska lying north of the 40th parallel of latitude and East of longitude 98 West of Greenwich, (herein referred to as the "Omaha District") . . .' (Sec. 2, Art. I)

"It also provided:

'If, in any year, ending June 30 during the term of this agreement, Northern shall fail to take the annual volume of gas as provided in this agreement, then within twenty-five (25) days after the end of such year Northern shall pay Republic (at the price in effect hereunder for gas delivered during such year) for the difference between said volume actually taken and the volume of gas which Northern should have taken during said year.' (Sec. 5, Art. II).

"3. In addition, the contract further provided:

'*Republic*, subject to the foregoing provisions concerning connected openflow capacity and subject to the conditions hereinafter stated, *shall always have the right to supply sixty per centum (60%) of the aforesaid requirements of Northern* up to a maximum of thirty-six billion five hundred million (36,500,000,000) cubic feet *per year* . . .' (Sec. I, Art. VIII.) (Underscoring supplied.)

'It is covenanted and agreed that if either party shall fail to perform any of the obligations or observe and faithfully keep any of the covenants imposed upon it under and by virtue of this agreement, then in such event the other party may at its option terminate this agreement by proceeding as follows: . . .' (Sec. 4, Art. VIII.)

'This contract is subject to all valid legislation with respect to the subject matter hereof, either state or federal, and to all valid present and future orders, rules and regulations of duly constituted authorities having jurisdiction.' (Sec. 2, Art. XII.)

"4. The gas rights in gas lands and gas leases by Republic dedicated under said contract are all presently located in the Kansas portion of the Hugoton Gas Field, hereinafter referred to as 'Hugoton Area'. The production of gas in the 'Hugoton Area' covered by said contract is governed by and is subject to all lawful orders, rules and regulations of The State Corporation Commission of the State of Kansas. By virtue of the statutory authority vested in said Commission, said Commission, under date of March 21, 1944, issued its Basic Proration Order No. 44-3-21, entered in its Docket No. C-164, governing the production of natural gas from the Kansas Hugoton Gas Field; pursuant to the authority of said Commission said Basic Proration Order as amended provides:

'n. That there shall be held two market demand hearings for each year. The first hearing shall cover the period from October 1st to March 31st, both inclusive; and the second shall cover the period from April 1st to September 30th, both inclusive. The allowable period established shall be a calendar month. The Commission shall issue its orders covering each allowable period, and such orders shall be issued on, or near, the first day of the month for which such order is issued.'

"Each month said Commission promulgates and issues its Gas Proration Order and Report for the Kansas Hugoton Gas Field, in which it determines the market demand for natural gas from the Kansas Hugoton Gas Field for each month and allocates among the several developed gas leases and wells in said field the amount of production of natural gas from each of said developed wells and leases, limiting the same during each month to the respective allowable established for said field and for each of the wells therein. Said Basic Proration Order further provides:

'p. Operators of wells and purchasers, or others taking gas from any well, shall endeavor to limit their takes of gas to the quantities fixed in the schedule as the allowable production for such well, provided, that if, during the period covered by any schedule there should develop a substantial increase in the amount of the market demand for gas from said field, the Director may permit production to be increased ratably from all the wells in the field to meet such emergency increased demand and the facts respecting same shall be reported to the Commission at or before the next periodic market demand hearing for such action thereon as may be proper. If, at the end of any proration period, there is an overage or underage in production for any well during such period, same shall be carried forward as a charge against or credit in favor of such well and subtracted from or added to, as the case may be, the allowable for such well for the next proration period. Any overage in production from any well during any proration period which is not equalized by ratable overages from all other wells in the field or which is not compensated for in the allowables fixed for other wells in the field for the next succeeding proration period or not otherwise made up within one year after the proration period in which it occurred, shall constitute illegal overproduction from such well and such well shall be shut-in until such overage is thereby fully made up. All wells with an overproduction of three times the amount of their current month's allowable shall be shut in by the operator or producer and not permitted to produce any gas until such overproduction has been fully absorbed by deductions from such overproduction made by current allowables.'

"5. That at all times Republic has been fully informed as to the volume of gas which it should be necessary for it to deliver to Northern and for Northern to receive to satisfy 60% of Northern's demands in the 'Omaha District' as in said Contract defined; that at all times up to and including the contract year ending June 30, 1947, Republic delivered to Northern and Northern received and paid for volumes of gas each contract year equal to or in excess of 60% of Northern's market demands in the 'Omaha District'.

"6. In July, 1947, some 63 wells of the defendant had produced gas in excess of the quantities authorized by the basic order for the Hugoton Field and the July, 1947, monthly allocation order of the Commission. Prior to July 1, 1947, the defendant had voluntarily shut in a number of its wells. On July 31, 1947, the Corporation Commission of the State of Kansas, by telegram directed defendant to shut in 63 of its wells for the reason that 62 of such wells had produced gas in excess of three times their current allowable, and one well had overproduced its authorized allowable for a period of one year or more. On the same date the Kansas Commission issued a formal writ-

ten order confirming its prior telegraphic order. Prior to the issuance of such shut in order, the Corporation Commission of the State of Kansas had cancelled underages which had been previously granted to the defendant's wells. Defendant had been given reason to believe that such cancelled production would be reinstated.

"On July 1, 1947, Republic had dedicated to the fulfillment of said Contract a total of 125 gas wells. From time to time additional wells have been so dedicated to the fulfillment of said contract. The Gas Proration Order and Report for the Kansas Hugoton Gas Feld issued by the State Corporation Commission of the State of Kansas for the month of August, 1947, ordered 80 wells of Republic dedicated to the fulfillment of said contract to be shut in during said month of August for overproduction as provided in pertinent proration orders in effect. During each of the succeeding months for the period from August, 1947, to and including June, 1948, the said Commission issued its Gas Proration Order and Report for the Kansas Hugoton Gas Field, fixing and determining the current monthly allowable production for each well located in said Field, including the gas wells of Republic dedicated to the fulfillment of said Contract, and ordering certain of Republic's gas wells shut in during each of such months because of such overproduction of gas from such wells in violation of the orders of said Commission. Gas wells which are shut in by order of said Commission may not during the period they are shut in produce any gas whatsoever until the overproduction from said wells has been absorbed by current monthly allowables attributable to such wells.

"That with respect to the 125 Republic wells dedicated to the performance of the aforementioned contract, from which its gas was to be produced and delivered to Northern in the performance thereof, such wells cumulatively on July 1, 1947 were overproduced 4,249,000 M. C. F. and for the month of July, 1947, had a cumulative current allowable of 1,749,087 M. C. F.; that during said month of July, 1947 Republic continued to produce its said wells at a rate in excess of the current monthly allowables granted to its said wells under the Proration Orders of the State Corporation Commission of the State of Kansas, with the result that on July 31, 1947, said Commission ordered Republic to shut in 80 of·its said wells because they were currently overproduced in excess of three times the amount of their current monthly allowable, as aforestated.

"That by months during the contract year from July 1, 1947 to June 30, 1948, there follows with respect to wells dedicated by Republic to the fulfillment of the terms of said Contract:

(a) the number of wells not shut in and permitted to produce gas;

(b) the current monthly gas allowable granted cumulatively by the State Corporation Commission of the State of Kansas attributable to Republic's wells not shut in;

(c) The positive net gas allowables for Republic's wells not shut in and permitted to produce;

(d) the number of wells so dedicated shut in by the State Corporation Commission of the State of Kansas because of Republic's excessive overproduction of gas therefrom;

(e) the cumulative current monthly gas allowable attributed to shut in wells which allowable was not permitted under the Basic Proration Order

of the State Corporation Commission of the State of Kansas to be produced until an accumulation thereof equaled the amount of the prior overproduction from such wells;

(f) the positive net gas allowables attributable cumulatively to Republic's shut in wells;

(g) the total volume of gas delivered by month to Northern by Republic and paid for by Northern;

(h) 60% of Northern's market requirements by month with respect to the 'Omaha District' demands (set forth in plaintiff's Exhibit 15).

| | "(a) | (b) | (c) | (d) | (e) | (f) |
|---|---|---|---|---|---|---|
| | Wells Not Ordered Shut-in by Kansas Commission | | | Wells Ordered Shut-in by Kansas Commission | | |
| Month, year | Number Wells | Current Allowable (MCF) | Positive Net Allowable (MCF) | Number Wells | Current Allowable (MCF) | Positive Net Allowable |
| July, 1947 | 125 | 1 749 087 | 769 171 | .. | ...... | ........ |
| August | 45 | 767 895 | 442 012 | 80 | 962 674 | ........ |
| September | 47 | 796 598 | 177 415 | 79 | 846 913 | ........ |
| October | 54 | 916 193 | 161 624 | 76 | 846 113 | ........ |
| November | 86 | 1 452 422 | 342 706 | 44 | 436 548 | ......... |
| December | 116 | 1 855 901 | 582 139 | 17 | 150 483 | ........ |
| January, 1948 | 128 | 2 512 732 | 568 996 | 5 | 29 157 | ........ |
| February | 131 | 2 087 029 | 379 006 | 2 | 4 211 | ........ |
| March | 131 | 2 197 095 | 406 877 | 2 | 4 433 | ........ |
| April | 132 | 1 811 151 | 452 919 | 1 | 3 464 | ........ |
| May | 127 | 1 518 248 | 292 412 | 6 | 33 408 | ........ |
| June | 128 | 1 655 535 | 193 278 | 6 | 34 723 | ........ |
| Total | | 19 319 886 | | | 3 352 127 | |

| | (g) | (h) |
|---|---|---|
| Month, year | Republic's Deliveries to Northern (MCF) | 60% Omaha District Requirements (MCF) |
| July, 1947 | 2 121 604 | 2 459 970 |
| August | 927 878 | 2 591 737 |
| September | 891 636 | 2 574 785 |
| October | 1 661 241 | 2 732 346 |
| November | 1 877 168 | 2 746 962 |
| December | 2 376 025 | 3 072 221 |
| January, 1948 | 2 127 954 | 3 364 237 |
| February | 1 989 152 | 3 313 868 |
| March | 2 164 214 | 3 301 293 |
| April | 1 837 456 | 2 861 991 |
| May | 1 652 173 | 3 001 201 |
| June | 1 536 687 | 2 805 494 |
| Total | 21 163 188 | 34 826 105 |

"7. On October 25, 1948, defendant notified plaintiff by letter that it had failed to fulfill its contractual obligations by not taking and paying for 1,508,-825,000 cubic feet of gas in the period July 1, 1947 to June 30, 1948. This communication was preceded by a letter dated June 12, 1948, in which the president of defendant stated that the volume of gas which plaintiff should take during the period ending June 30, 1948, could not be accurately determined but that the total available to plaintiff is substantially below the 60% requirement of the contract. He requested a report of the total amount of gas purchased by plaintiff for the period ending June 30, 1948, as soon as possible after that date. Defendant in its letter of October 25, 1948, did not insist that plaintiff should have purchased a volume equaling 60% of the Omaha District requirements but chose to accept the volume of 22,672,013,000 cubic feet as satisfying the contractual obligation of plaintiff.

"22,672,013,000 cubic feet of gas is the sum of the total monthly allowable assigned to the wells of Republic dedicated to this contract before being diminished by the overproduction which was the basis of the shut-in order.

"Thereafter, and on July 12, 1948, Republic billed Northern for $90,529.50 for 1,508,825,000 cubic feet of gas for the contract year ending June 30, 1948, over and above the volume of gas actually delivered by Republic and received and paid for by Northern during such contract year.

"9. Under date of October 28, 1949, Republic wrote Northern a letter informing Northern that Republic exercised its alleged optional right to terminate said Contract because of Northern's alleged failure to take or pay for 1,508,825,000 cubic feet of gas in the contract year ending June 30, 1948, in addition to that which was delivered by Republic in such contract year and paid for within twenty-five days following June 30, 1948; that on the 21st day of November, 1949, and within thirty days of Northern's receipt of Republic's purported notice of the cancellation of the contract, Northern filed this action in this Court denying any liability to Republic for the 1,508,825,000 cubic feet of gas which was not delivered by Republic, but as evidence of its good faith and in compliance with the terms of such Contract, Northern concurrently with the filing of said petition deposited with the Clerk of this Court the sum of $90,529.50 to be paid to Republic in the event it should finally be adjudged in this action that said sum of money was owing to Republic by Northern, otherwise such money to be returned to Northern; that in this action and in Northern's petition filed herein and its evidence in support thereof, it is found that Northern is now and at all times has been ready, willing and able to perform its obligations under said Contract in full and to pay the $90,529.50, or any other sum to Republic, in event it is finally adjudged in this action that such monies are due Republic from Northern; that Northern in compliance with the provisions of the Contract has indemnified Republic for any and all consequences of the alleged breach on the part of Northern which Republic contends exists, if in fact it be finally adjudged in this action that Northern has breached any of its obligations under said Contract.

"10. That during the contract period, July 1, 1947 to June 30, 1948, representatives of plaintiff and defendant discussed the effect of the said shut-in order in connection with gas which would be produced during the period in

controversy. Estimates were made as to the volume of gas which could be produced from defendant's wells and not be in violation of the monthly allowable allocation of the Kansas Corporation Commission. In nearly all of such discussions defendant's representative suggested delivery of more gas. On March 12, 1948, defendant's representatives in a letter addressed to Plaintiff's representatives, requested that defendant accept delivery of the current monthly allowable from the wells covered and included in the contract in controversy. Subsequent to such date, the plaintiff did not take the current monthly allowable as shown by the monthly schedules of the Kansas State Corporation Commission.

"In the conversations above referred to the representatives of plaintiff and defendant did, in fact, agree as to the amount of gas to be produced by Republic and received by Northern during the particular months which were the subject of the conversations, although in most instances Republic's acquiescence was reluctant, and Republic did not intend by such acquiescence to modify the terms of the contract. That ordinarily Republic's deliveries closely approximated the amounts so agreed upon, but that in some instances they fell below the agreed or suggested amounts.

"11. On June 12, 1948, the President of the defendant corporation advised plaintiff that, according to defendant's estimates, plaintiff had failed to take the current allowable of Republic for the period of July 1, 1947 to July 1, 1948, in an amount of approximately 1,220,000,000 cubic feet. He also called the attention of the plaintiff to Section 5, Article II of the contract of December 31, 1945, and requested that plaintiff supply defendant with information concerning its purchases as soon as possible after June 30, 1948, so that the amount of money due the defendant could be determined. At no time prior to the filing of the within action did plaintiff refuse to pay defendant the amount of money which is in controversy in this action.

"12. In July, 1947, defendant's wells had a deliverability, and were capable of producing into its lines two hundred and sixty-one million cubic feet daily, and in July, 1948, a deliverability of two hundred ninety million cubic feet daily. During the period in controversy, the average monthly pressure maintained by defendant at its delivery point ranged from two hundred sixty-four pounds (264) to two hundred ninety-eight (298) pounds. Plaintiff held the pressure at its receiving point close to two hundred ninety (290) pounds, but always less than the pressure maintained by defendant. The 135 gas wells of the defendant are not all of the same size. There is a variance of over one hundred per cent (100%) in the open flows of the wells. The open-flow of defendant's individual wells is as high as 35 and on an average are from 15 to 16 million cubic feet a day. Defendant had on hand and available for delivery a sufficient volume of gas to enable it to deliver to plaintiff the 1,508,-825,000 cubic feet of gas during the period in controversy, and was ready, able and willing so to do, without regard to the effect such production might have upon the standing of Republic's wells under the basic order of the State Corporation Commission. Northern was at all times ready, able and willing to receive, purchase and pay for said 1,508,825,000 cubic feet of gas during the period in controversy if the same could have been produced by Republic

without jeopardizing its ability to produce and deliver gas continuously and without interruption as specified in the contract.

"13. The contract of December 21, 1945, committed defendant to sell the gas produced from the wells dedicated thereunder exclusively and only to the plaintiff for its term. In addition the pipe lines constituting the gathering system of the defendant were committed to the exclusive delivery of gas to the plaintiff. Defendant was forbidden by the terms of its contract to sell gas produced from its wells to others than the plaintiff.

"14. Subsequent to June 30, 1948, defendant had delivered to plaintiff substantial quantities of gas from the wells which were covered by the contract of December 21, 1945. During such period of time plaintiff never refused to pay defendant the amount in controversy. On December 1, 1949, defendant notified plaintiff by telegram, that the price of all gas supplied to plaintiff would be twelve (12) cents per thousand cubic feet under conditions set forth in the communication. Plaintiff declined to acquiesce in increasing the price to twelve cents and so notified defendant by letter on December 1, 1949. From June 30, 1948, the plaintiff conducted its business in the usual and ordinary way, made contracts for increased demand with its customers and included the estimates of reserves of defendant in hearings before the Federal Power Commission, in connection with its financing.

"15. That in the performance of the Contract Republic has at all times had the complete and exclusive control over the operation of its gas wells dedicated to the fulfillment of such contract, its gathering system, its measuring station through which such gas is measured and its facilities leading from such measuring station to Northern's pipe line; that at no time since the execution of the Contract have any valves in Northern's intake pipelines been closed, except for occasional temporary shut downs of not to exceed eight hours in length for the purpose of making repairs; that no representative of Republic ever complained that the pressures maintained by Northern in its pipelines prevented or would prevent Republic from delivering gas to Northern, and Republic does not contend that the pressures maintained by Northern in its pipelines prevented Republic from delivering gas to Northern; that the volume of gas delivered by Republic and taken or received by Northern has at all times depended upon the number of wells of Republic which it has opened up and permitted to produce; that during the contract year ending June 30, 1948, 9 wells in addition to those in existence on July 1, 1947 were connected by Republic and dedicated to the performance of said contract; that there follows a tabulation of (a) the number of Republic wells dedicated under Contract by month which because of not being shut in due to excessive overproduction were permitted to produce, and (b) the average number of such Republic wells by month in production in the contract year ending June 30, 1948:

| Month, year | (a)<br>Number of Republic's<br>Wells available to<br>be produced | (b)<br>Average number Wells<br>Permitted by Republic<br>to produce |
|---|---|---|
| July, 1947 | 125 | 48 |
| August | 45 | 19 |
| September | 47 | 19 |
| October | 54 | 35 |
| November | 36 | 39 |
| December | 116 | 68 |
| January, 1948 | 128 | 66 |
| February | 131 | 67 |
| March | 131 | 79 |
| April | 132 | 52 |
| May | 127 | 37 |
| June | 128 | 42 |

that the pressures maintained in Northern's pipelines were at all times such that if Republic had produced the quantity of gas which Republic contends Northern should have taken, to-wit: 1,508,825,000 cubic feet, such volume of gas would have been delivered into Northern's pipelines and by it received.

"16. That in order that a natural gas pipeline company may function adequately and satisfactorily serve the public who are dependent upon it, the volume of gas received by such company and thus available to satisfy its market demands must be continuous and constant in amounts from day to day; that in the performance of its obligations in supplying its customer requirements and in making new commitments for gas Northern has at all times relied upon the continuation of its purchases of gas from Republic under the Contract; that in the contract year ending June 30, 1947, the deliveries of gas from Republic to Northern were under this Contract approximately 30% of Northern's entire requirements, and in the contract years subsequent thereto Republic's deliveries of gas under the Contract have been approximately 18% of Northern's entire requirements; that the termination of the Contract cutting off the supply of gas from Republic to Northern would be a very serious matter to Northern in the performance of its obligations to its customers. That during the contract year, July 1, 1947 to June 30, 1948, because of the overproduction of gas by Republic, Republic was in a perilous position with respect to the production of gas from its wells dedicated to the fulfillment of the Contract, and during said year Republic produced and delivered to Northern and Northern received and paid for all of the gas which Republic thought it could produce and still not have additional wells shut in because of overproduction.

"17. As of July 1, 1947, Republic's wells dedicated to the performance of the Contract were overproduced 4,249,000 M. C. F. of gas. If the 1,508,-825,000 cubic feet of gas for which Republic seeks payment, but which was not delivered by Republic or received by Northern, had been produced by Republic in the contract year ending June 30, 1948, Republic's said wells as a group would have been overproduced 4,249,000 M. C. F., such overproduction being exactly in the same volume as existed on July 1, 1947, and consider-

ing the monthly allowable granted such Republic wells by the State Corporation Commission of the State of Kansas for the month of July 1, 1948, Republic's wells as a group would have been overproduced 2.6 times the total month's current allowable granted thereto; assuming Republic had produced the volume of gas which it did produce from its wells dedicated to the performance of this contract in the contract year ending June 30, 1948, and again in the contract year ending June 30, 1949, and in addition thereto had produced the 1,508,-825,000 cubic feet of gas for which it contends Northern is obligated to pay, Republic's such dedicated wells as a group would have been on June 30, 1949 overproduced approximately 3 times their current monthly allowable for the month of July, 1949; assuming Republic's wells dedicated to the performance of this Contract had produced the volume of gas which was actually produced in the contract year ending June 30, 1948, and in addition thereto had produced the 1,508,825 cubic feet of gas for which Republic contends Northern should pay, and further assuming that Republic had produced the volume of gas from its said wells which was actually produced thereafter and up to August 1, 1949, Republic's wells would have on August 1, 1949, as a group have been overproduced approximately 3 times their then current monthly allowable, subjecting those of said wells which were produced in excess of 3 times their then current monthly allowable to being shut in for approximately three months or until such overage in production was equaled by subsequent monthly allowed production to such wells; that during any such shut in period Republic would not have been able to have delivered gas to Northern without interruption in the satisfaction of Northern's market demands in the 'Omaha District'.

"18. That notwithstanding Republic's contention that Northern had breached the contract by failing to pay $90,529.50 for said 1,508,825,000 cubic feet of gas in addition to the gas which was actually delivered by Republic and received and paid for by Northern in the contract year ending June 30, 1948, Republic elected to continue the contract in existence and to operate thereunder for seventeen months and until December 1, 1949; that Republic from month to month delivered gas to Northern in volumes approximating the monthly current allowables granted by the State Corporation Commission of the State of Kansas to Republic's wells and Northern received such volumes of gas and paid Republic therefor; that at no time since the end of the contract year June 30, 1948, have Republic's deliveries of gas been substantially equal to 60% of Northern's market demands in the 'Omaha District', but in each contract year have exceeded 12,500,000,000 cubic feet of gas.

"19. That on or about December 1, 1949, Republic wired Northern demanding that Northern pay Republic at the rate of 12% per M. C. F. for all gas by Republic thereafter delivered to Northern under the facilities theretofore in use under Contract; that Northern immediately responded by wire to Republic that such Contract was still in force and effect and that the price paid for such gas was controlled by such Contract; that thereafter in January, 1950, Northern paid to Republic at 6% per M. C. F. the purchase price of the gas delivered by Republic and received by Northern in the month of December, 1949; that while such payment was retained by Republic, it immediately notified Northern that it contended twice such amount of payment should have

been made and made demand for such difference in payment; that Northern immediately responded to Republic that such payment as made by Northern to Republic was correct and in accordance with the terms of such Contract; that payments on the same basis, followed by similar exchanges of correspondence or wires between the parties, have been made each month subsequent to January, 1950.

"20. That during the months of December, 1949 and all months subsequent thereto Republic has continued to deliver gas to Northern from Republic's wells theretofore dedicated to the performance of Contract through Republic's gathering system at the delivery point designated in such contract substantially in accordance with the current monthly allowables granted Republic's wells by the State Corporation Commission of the State of Kansas; that since December 1, 1949, Republic has dedicated newly completed wells under said Contract and has, as one of the steps in securing approval of the acreage allocation to such wells and the granting of monthly allowables thereto by the State Corporation Commission of the State of Kansas, represented to such Commission that the gas which may be produced therefrom will be by Republic sold to Northern under Contract; that negotiations as contemplated by such Contract have been instituted and are being conducted by both Northern and Republic for the determination of the price to be paid Republic by Northern for gas which may be delivered under said contract subsequent to July 1, 1951. Republic's witness before the State Corporation Commission at the hearing in question also advised the Commission that the contract was at the time in litigation.

"21. That an actual controversy exists between Northern and Republic as to the correct interpretation of the contract and the rights and obligations of the parties thereunder.

---

### "CONSTRUCTION OF CONTRACT

"The Court construes pertinent provisions of the contract between Northern and Republic, dated December 21, 1945, as follows:

#### No. 1: *Annual Minimum and Maximum Volumes.*

"The pertinent provisions dealing with this subject may be briefly summarized as follows:

"Article I, Section 2. Northern agrees to purchase and receive and Republic agrees to sell and deliver, sixty (60) per cent of Northern's market requirements in the Omaha District.

Article I, Section 3. The overall minimum is fixed at 12,500,000,000 cubic feet and the overall maximum is fixed at 36,500,000,000 cubic feet.

Article I, Section 4. The rate of delivery required shall never exceed 100,000,000 cubic feet in any 24 hour period.

"Article VIII, Section 1, Paragraph 1. Again refers to a minimum of 12,500,000,000 cubic feet and provides that the right to supply such minimum shall depend upon Republic's wells having an open flow at all times during the contract period of at least 342,465,750 cubic feet of gas per day.

Paragraph 2.   Again affirms the right of Republic to supply at least 60% of Northern's requirements in its Omaha District, but provides that in order to enjoy such privilege the open flow of Republic's wells shall maintain a specified level.

Paragraph 3.   Provides for modification of the foregoing provisions and volumes in the event Republic's wells become so depleted as to be unable to furnish the specified volumes of gas.

Article XII, Section 2.   Provides that the contract shall be subject to all valid legislation, and to all valid orders, rules and regulations of duly constituted authorities having jurisdiction.

"Based upon the foregoing provisions of the contract, it seems clear, and the court so holds, that Republic has the right to sell and deliver and Northern has the obligation to receive and pay for natural gas in an amount equal to the greater of 12,500,000,000 cubic feet annually or 60% of Northern's Omaha District annual requirements, not in excess of 36,500,000,000 cubic feet annually, and at a rate not exceeding 100,000,000 cubic feet in any 24 hour period, provided:

"(a) the open flow and other physical attributes of Republic's wells conform to the specifications contained in the contract, and

"(b) Republic may lawfully produce such gas under pertinent valid rules and regulations of any duly constituted authority, which authority presently is, and during the period in controversy was, the Kansas State Corporation Commission;

"(c) By lawful production is meant production in conformity with the spirit and intent of the basic order in the Hugoton field designated as Order No. 44-3-21, Paragraph "P", which is quoted in part in finding of fact No. 4 herein, the opening sentence of which reads in part as follows: 'Operators of wells and purchasers or others taking gas from any well shall endeavor to limit their takes of gas to the quantities fixed in the schedule as the allowable production for such well. . . .'

"The Court holds that it is the duty of both the producer and the purchaser to endeavor to limit their takes for any given period to the amount of the net allowable shown on the proration schedule for such period; the net allowable being the current allowable as the same may be enlarged by existing underages or diminished by existing overages.

"The right of Republic to sell and deliver this volume of gas is not, however, optional with Republic. Northern has an equally valid and enforceable right to demand and receive the same volume of gas, subject to the same conditions.

"No. 2. *Tender and Delivery of Gas.*

"(a) Article I, Section 4 of the Contract provides substantially as follows:

"Article I, Section 4.   Provides that so far as practicable, and without interruption, Republic shall deliver and Northern shall take gas in accordance with Northern's market demands in the Omaha District, and that Northern shall from time to time notify Republic of any anticipated increase in such daily requirements, etc.

"The foregoing casts upon Northern the duty to determine and to notify Republic of its daily requirements, or other periodic requirements, within the

limits specified in the contract; and, having been so notified it is Republic's duty to supply such volumes of gas.

"Republic has no way of ascertaining what Northern's Omaha District demands are or will be from time to time, except as it is advised by Northern; and to hold that Republic has the right to deliver and enforce the acceptance of volumes of gas not exceeding 100,000,000 cubic feet daily, without regard to market requirements of Northern's Omaha District, would violate this specific section, as well as the spirit of the entire contract.

"It therefore follows that Republic, in the fulfillment of its contract obligation, is not required to tender to Northern, or to attempt forcibly to deliver into Northern's lines, more gas than Northern has indicated it will take; and it is Northern's duty to so regulate its takes from day to day or from month to month that at the end of any given contract year it will have received the volume of gas which Republic is entitled to produce and deliver to Northern for that particular year.

"(b) The Court construes Section 1 of Article V of the Contract to require that deliveries of the required volumes of gas by Republic to Northern and production thereof by Republic shall be from a sufficient number of Republic's wells to effect such deliveries at the point of delivery into Northern's pipe line at the highest pressure which can be efficiently maintained by the natural pressure of gas from wells connected to Republic's gathering system and to so operate its said wells and gathering system that delivery of the required volumes of gas may be made by Republic; provided further, however, that so long as the weighted average field pressure of the wells from which gas is at the time being delivered hereunder shall exceed one hundred fifty (150) pounds, the delivery pressure shall not be less than one hundred (100) pounds to the square inch. In the event that the weighted average field pressure of the wells from which gas is at the time being delivered hereunder shall fall to one hundred fifty (150) pounds (or less) said required delivery pressure may be reduced to not less than fifty (50) pounds per square inch.

"No. 3. *Maintenance of Wells.*

"Article VIII, Section 1, commencing with the last paragraph on page 17 of the contract contains the following provisions:

'Republic covenants and agrees that it will at all times maintain its gas wells in good condition and to use its best endeavors at all times to maintain a supply of gas adequate to meet Northern's aforesaid requirements under all conditions of this contract'.

"The Court construes this provision to mean not only that Republic will maintain its gas wells in good physical condition, but also that it will maintain their status under the Basic Order of the Corporation Commission in such condition that they will be permitted to produce in conformity with the spirit and intent of this Order and are not in imminent danger of being shut in for overproduction.

"No. 4. *Failure of Northern to Take.*

"(a) The Court construes Section V of Article II of said contract to mean that if in any year ending June 30 during the term of the contract Northern shall fail to take the minimum volume of gas which Republic is entitled to produce and deliver for that year, under the construction placed upon said

contract in Paragraph No. 1 hereof entitled 'Annual Minimum and Maximum Volume', then within twenty-five (25) days after the end of such year Northern shall pay Republic 'at the price in effect under said contract for gas delivered during such year' for the difference between the volume of gas actually taken and the volume of gas which Northern should have taken during such year, provided Republic shall, during such year, have been at all times ready, able and willing to deliver such minimum volume of gas continuously and without interruption in daily or other periodical amounts approximating the amounts designated by Northern for such respective periods.

"(b) Section 5 of Article II makes no mention of payment of interest upon sums owing from Northern to Republic under the circumstances described therein. But the Statute, G. S. '35, Sec. 41-101, reads in part as follows: 'Creditors shall be allowed to receive interest at the rate of 6% per annum when no other rate of interest is agreed upon, for any money after it becomes due. . . .'

"The Court holds that the quoted section of the statute applies to any obligation for which Northern may become liable under this section of the contract.

"(c) It has been argued that the take or pay provision in Section 5 of Article II is unenforcible as constituting a penalty not providing for the proper measure of damages, and as being against public policy, and numerous cases have been cited in support of counsel's position. In the usual case of a contract providing for the purchase and sale of merchandise, where an open market exists and the buyer refuses or fails to accept delivery of the merchandise which by the contract he is required to accept, the weight of authority, including the decisions of the Kansas Supreme Court, probably supports the rule that the full contract price may not be collected as damages, and that the seller is obligated to endeavor to minimize his damages by disposing of the property upon the open market or through other channels. However, in the instant case the court takes judicial notice of the fact that the merchandise which is the subject of this contract is of a migratory nature, and that it may flow from under the acreage dedicated to the contract to other acreage; that if the wells on the dedicated acreage are restricted in their production far below the production authorized by the State Corporation Commission and the wells on adjoining acreage are produced to approximately the amount of such allowable, the gas under the dedicated acreage will migrate to the adjoining acreage and may be forever lost to the seller.

"In addition to this, under the terms of the dedication of this acreage, and of the gathering system and other facilities necessary to produce the gas and deliver into the system of Northern, Republic is prohibited from tendering or selling any portion of such gas to any other person, and is prohibited from using the gathering facilities owned by it and used in connection with the production of gas for the transportation and delivery of any such gas to any other purchaser. (Art. VII, Secs. 1, 4 and 6.)

"Thus, the reason for the general rule fails in the instant case, and to enforce this rule would work an unreasonable hardship on Republic since Republic has no way of protecting itself or minimizing its damage by disposing of the gas in other channels in the event of the refusal of Northern to accept delivery.

"The Court therefore construes this section of the contract in this respect as being reasonable, just and enforcible.

"No. 5. *Default, Right of Cancellation.*

"Article VIII, Section 4, grants the right to either party to cancel the contract in case of default of the other, and provides procedure to be followed.

"Sections 5 and 6 of Article II fix the liability of Northern for payment of any gas which is received under the contract or which should have been received but which Northern refuses to accept, and under the construction of said contract as hereinbefore contained it is held that Republic is entitled to collect interest upon any such items as may be in default, from the date of default until payment thereof; interest on the amounts accruing under Section 6 of Article II being subject to the limitation in said Article contained.

"In the opinion of the Court Republic is amply protected in case of default in payment of accounts due from Northern under this contract by said Sections 5 and 6 of Article II, and the privilege of cancellation of the contract for simple default in payment of such account does constitute a penalty which is unfair and unreasonable, and which should not be permitted.

"This section, therefore, is construed by the Court not to authorize the right of cancellation for simple default or delay in payment of accounts accruing under the contract.

"CONCLUSIONS OF LAW

I.

"That both Northern and Republic have at all times fulfilled their obligations under the contract dated December 21, 1945, between Republic and Northern, and that Republic's notice to Northern of Northern's alleged breach of said contract, dated October 28, 1949, is without legal effect.

II.

"The delivery by Republic and receipt and payment therefor by Northern of the total volume of gas delivered by Republic to Northern under said contract during the contract year ending June 30, 1948, was, under the facts and circumstances existing during said contract year as disclosed by the evidence in this case, in complete satisfaction of the obligations of the parties thereto with respect to the total volume of gas to be delivered by Republic and to be received and paid for by Northern under said contract for that contract year.

III.

"That in the year or years immediately preceding the contract year ending June 30, 1948, both Northern and Republic knew, or in the exercise of diligence should have known, the amount of the allowables granted to Republic's wells dedicated to the contract, and both parties acquiesced in the overproduction of Republic's wells to the extent that many of them were shut in by order of the State Corporation Commission soon after the commencement of the contract year ending June 30, 1948, and neither party should be permitted to take advantage of the action of the other in either overproducing said wells or in acquiescing to such overproduction.

## IV.

"That the failure of the Republic to produce and Northern to receive and pay for the volume of gas in question, to-wit, 1,508,825,000 cubic feet was due to the fact that this volume of gas had been produced by Republic, delivered to Northern and paid for by Northern in the year or years immediately preceding the contract year ending June 30, 1948.

"That for the period commencing with the date of the execution of said contract and ending June 30, 1948, Republic had produced and delivered to Northern, and Northern had received and paid Republic for approximately the amount of the total current allowable granted by the State Corporation Commission during that period to the wells of Republic dedicated to this contract.

## V.

"That the production by Republic of the 1,508,825,000 cubic feet of gas in question during the contract year ending June 30, 1948, would have jeopardized the position of Republic's wells and would have made it impossible for Republic to have thereafter performed its obligation to deliver gas continuously and without interruption as required by Northern as specified in the contract.

## VI.

"That neither party has breached the contract; that Northern is not liable to Republic in the sum of $90,529.50, or any other sum by reason of the failure of Republic to produce and deliver or of Northern to receive and pay for the volume of gas in question, and that the certified check deposited by Northern with the Clerk of this court at the commencement of this action should be by the Clerk returned to Northern.

## VII.

"That the costs of this proceeding should be borne equally by the parties hereto.

"Dated this 5 day of January, 1951."

In due time Northern moved for the modification of the wording of two of the findings of fact. This was sustained. Republic moved to modify the findings of fact, the construction of the contract and the conclusions of law in many particulars. This was allowed in a few minor particulars and overruled as to most of them. Republic also moved for a new trial, which was overruled. Judgment was rendered for plaintiff in harmony with the court's modified findings of fact, construction of the contract and conclusions of law. Republic in due time filed a notice of appeal from all adverse rulings and listed numerous specifications of error. In this court Republic presents the questions involved for our determination as follows:

"1. May refusal to perform a definite contractual obligation to purchase a specified amount of natural gas from designated producing wells be excused on the ground that the gas not taken, although available, could not have been produced lawfully when:

"(a) admittedly the required quantity of gas could have been produced and delivered without exceeding three times the current allowable for the wells in question, and

"(b) the Commission's own order unequivocally provides that overproduction is not unlawful unless and until it exceeds three times a well's current allowable, and

"(c) the Commission and the litigants have all given an operative construction to the applicable order as rendering production 'unlawful' only when it exceeds three times the current allowable of a producing well, and

"(d) the refusal to perform the contract was not based upon the ground that the rejected gas could not have been lawfully produced.

"2. Is a provision in a gas purchase contract which provides that either party thereto shall have the right to terminate the same upon the default of the other party, unenforceable by the seller when the buyer defaults in its contractual obligation to take or pay for a specified quantity of gas."

The gist of this lawsuit is embodied in the first question with its subdivisions, stated by Republic to be involved here. The question is founded upon the contention that Republic may lawfully produce and sell all the gas it can produce from its wells so long as it does not produce from any one of the wells, or all of them, more than three times the amount allotted to each well, or all of them, by the state corporation commission. This contention is erroneous. It is predicated solely upon the latter portion of paragraph "p" of the Commission's basic order of March 21, 1944, quoted in the trial court's findings. It ignores the first part of the same paragraph, which as applied to Republic, reads:

"Operators of wells . . . shall endeavor to limit their takes of gas to the quantities fixed in the schedule as the allowable production for such well, . . ."

This is the basic rule which governs Republic's operation of its wells. This is followed by a proviso:

". . . that if, during the period covered by any schedule there should develop a substantial increase in the amount of the market demand for gas from said field, the Director may permit production to be increased ratably from all the wells in the field to meet such emergency increased demand . . ."

and report that fact to the Commission. There is no contention in this case that any increased production was allowed by the director by virtue of this proviso. It is true that the latter part of the paragraph provides in substance that a well which produces more than three times the amount of gas allowable to it shall be shut in. Perhaps these provisions were inserted because of the difficulties operators would encounter in attempting to hold pro-

duction of their wells to the specific allowables named by the Commission and to afford a workable leeway. Certainly they were not designed to nullify the provisions in the earlier part of the paragraph. Apparently it is the contention of Republic that the only penalty it may sustain for overproduction from its wells is to have them shut in. That view, however, is inaccurate. There may be penalties (G. S. 1949, 55-708) or injunctions (G. S. 1949, 55-709). And, aside from those provisions, clearly such conduct is not in harmony either with the statute (G. S. 1949, 55-703) or with the rules of the Commission which it is authorized to make under the section last cited and G. S. 1949, 55-704.

While but two paragraphs, "n" and "p" of the Commission's order of March 21, 1944, were copied in the trial court's findings, the entire order was in evidence. We need not quote from it at length since the parties are familiar with it and it is available to anyone interested. It describes the Hugoton gas field much as was done in *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 169 Kan. 722, 724, 222 P. 2d 704; 170 Kan. 341, 225 P. 2d 1054, to which reference is made and in which case Northern was a party. It is a large field, a common source of supply, and many producing wells have been drilled into it by various gas operators. Acting under the state's police power our legislature in 1935 (Chap. 213, Laws 1935) enacted a statute applicable to the Hugoton gas field (now as amended, Chap. 55, Art. 7, G. S. 1949) relating to the production and conservation of natural gas. Its principal purpose is to prevent waste, which it undertook to prohibit. The state corporation commission was vested with jurisdiction over the subject matter of the act. One of the problems to be regulated was orderly production as between operators so as to enable each operator to produce his fair share of the gas from the common pool. To accomplish this the commission, after extended study and repeated hearings, made its basic order of March 21, 1944, which has been amended in a few details not here important. Under this the commission from time to time fixes allowables for the production of gas from each well, and group of wells, in the Kansas portion of the Hugoton gas field. It is essential that operators in that field "limit their takes of gas to the quantities fixed in the schedule as the allowable production" for each well or group of wells, as nearly as that can reasonably be done, as provided in paragraph "p" of the basic order; otherwise, equitable production cannot be maintained.

Able and industrious counsel for Republic have argued the first of the questions they state as being involved in this appeal under several subheads, each of which is predicated upon the theory that the latter portion of paragraph "p" of the basic order allows Republic to produce gas from each of its wells to the amount just under three times the allowable for such well. The theory is wrong. The allowable for each well is the amount stated by the commission as allowed to it,—not 2.99 times such amount. We have given careful study to the arguments of counsel on this question and to the authorities cited by them, but see no necessity for an extended review thereof. We are satisfied with and adopt the findings of fact, construction of the contract and conclusions of law relating thereto made by the trial court.

In view of what we have said upon the question which is the gist of this lawsuit the second question stated by Republic as being involved for our determination becomes an academic one. Counsel for appellant in their brief are frank enough to say:

"In the first instance defendant concedes that plaintiff removed the default which it committed during the year ending June 30, 1948, from the scope of said provision (Art. VIII, Sec. 4, Contract), by the depositing of the sum of $90,529.50 with the Clerk of the District Court of Stevens County, Kansas. Therefore, we do not have present in this appeal the question whether the contract should be terminated by reason of such default."

In this situation we find no necessity of passing upon that portion of the trial court's ruling which pertains to that matter. When a situation arises which the parties think calls for the construction of this provision of the contract it may be done upon the facts. pertaining thereto.

The judgment of the trial court is affirmed.

### APPENDIX "A."

"(Immaterial parts omitted.) GAS PURCHASE CONTRACT.

"This Contract, made and entered into this 21st day of December, 1945, by and between Republic Natural Gas Company, a Delaware corporation, as party of the first part, hereinafter referred to as 'Republic' and Northern Natural Gas Company, a Delaware corporation, as party of the second part, hereinafter referred to as 'Northern';

"Witnesseth: That in consideration of the covenants and agreements hereinafter set forth to be kept and performed by the parties, it is hereby agreed as follows:

"ARTICLE I. GAS TO BE PURCHASED AND SOLD. Section 1. *Sale and Purchase Commitments.* Subject to the terms and conditions and within the limitations hereinafter set forth, Republic agrees to sell and deliver to Northern

and Northern agrees to receive, purchase and pay for natural gas in its natural state produced or purchased by Republic in the 'Hugoton Area' which, for the purposes of this contract, is defined to mean lands located in Stevens, Morton and Grant Counties, Kansas, and Texas County, Oklahoma, and Counties in Kansas and Oklahoma immediately adjoining said Stevens, Morton or Grant Counties, Kansas, or Texas County, Oklahoma.

"Section 2. *Volume to be Purchased and Sold.* The quantity of gas which Northern agrees to purchase and receive from Republic and Republic agrees to sell and deliver to Northern shall be sixty per centum (60%) of all gas which Northern may take or use, or cause to be taken or used, during the term of this contract, for the requirements of Northern for serving from its said pipe line and any extension thereof which Northern may make, all or any portion of that part of the States of Iowa and Nebraska lying North of the 40th parallel of latitude and East of longitude 98 West of Greenwich (herein referred to as the 'Omaha District'), which is hereby agreed to mean the total of: (a) Sixty per centum (60%) of all gas sold by Northern in the Omaha District after adjusting sales pressure basis of measurement to the purchase basis of measurement, viz.: 16.4 pounds per square inch absolute pressure. Subsections (5), (c) and (d) omitted.

· "Section 3. *Annual Minimum and Maximum Volumes.* The aggregate volume of gas to be purchased by Northern and delivered by Republic hereunder during the twelve months' period beginning July 1 of each year shall not be less than 12,500,000,000 nor more than 36,500,000,000 cubic feet.

"Section 4. *Rate of Delivery.* So far as practicable, and without interruption, Republic shall deliver and Northern shall take gas in accordance with Northern's market demands in the Omaha District, and Northern shall, from time to time, notify Republic of any anticipated substantial increase in such daily requirements; provided, however, that Republic shall never be obligated to deliver more than 100,000,000 cubic feet of gas during any 24-hour period; and provided further that it shall be deemed that Northern has complied with its obligation to take gas under this Aricle I if, on the 31st day of December of each year, Northern, so far as practicable, shall have taken during the preceding six months the volume of gas specified herein, and if on or before June 30 of each year Northern shall have taken during the preceding twelve months the total amount of gas herein required.

"ARTICLE II. PRICE AND PAYMENT. Section 1. *Initial Price for Gas.* For all natural gas delivered hereunder to and including the 30th day of June, 1951, Northern shall pay Republic six cents (6¢) per thousand cubic feet.

"Section 2. *Adjustment of Price for Gas.* For all natural gas delivered hereunder subsequent to June 30, 1951, the price to be paid shall be adjusted every third year as provided in subparagraph (a) and (b) of this Section, but in no event shall said adjusted price be less than six cents (6¢) nor more than ten cents (10¢) per thousand cubic feet.

"(a) *By Agreement of Parties.* Not later than June 30 of each third year, beginning with the year 1950, Northern and Republic shall negotiate and agree upon the price to be paid by Northern for gas to be delivered hereunder during the three-year period beginning with July 1 of the following year. (b) *By Arbitration.* In the event the parties shall fail to agree upon a price by

November 1 of any year in which the price is to be adjusted, then the determination of such price for the three-year period, beginning with July 1 of the following year, shall be made by arbitration in the following manner: Subsections (b), (i), (ii), (iii) and (iv) omitted. Section 3 omitted.

"Section 4. *Payment for Gas.* On or before the tenth day of each calendar month Republic shall render Northern a statement of the daily volumes of gas delivered hereunder by Republic during the preceding calendar month and shall accompany said statement with supporting meter charts which shall be returned to Republic after examination. Northern agrees to make payment on or before the 25th day of each month for all gas delivered hereunder during the preceding month.

"Section 5. *Penalty for Failure to Take.* If, in any year ending June 30 during the term of this agreement, Northern shall fail to take the annual volume of gas as provided in this agreement, then within twenty-five (25) days after the end of such year Northern shall pay Republic (at the price in effect hereunder for gas delivered during such year) for the difference between said volume actually taken and the volume of gas which Northern should have taken during said year.

"Section 6. *Penalty for Failure to Make Prompt Payment.* If at any time Northern shall fail to pay any amount due to Republic for gas delivered hereunder when the same is due, unless in good faith contested, interest thereon shall accrue at the rate of six per centum (6%) per annum from the date when such amount is due until the same is paid. If such failure to pay, unless in good faith contested, continues for a period of sixty (60) days, Republic may suspend deliveries of gas hereunder, but the exercise of such right shall be in addition to any and all other remedies available to Republic. Section 7. *Payment for Gasoline* (omitted). Section 8. *Taxes* (omitted).

"ARTICLE III. MEASUREMENT. Section 1. *Unit of Measurement.* The unit of measurement for natural gas delivered hereunder shall be one thousand (1,000) cubic feet of gas computed at a pressure basis of two pounds (2 lbs.) per square inch above fourteen point four pounds (14.4 lbs.) absolute pressure, and at a storage and flowing temperature agreed upon for the purpose of this contract to be sixty degrees (60°) Fahrenheit; corrections to be made for pressures according to Boyle's Law and for actual temperature and specific gravity according to tests as hereinafter provided. Section 2. *Correction Factors* (omitted). Section 3. *Meters* (omitted). Section 4. *Check Meter* (omitted). Section 5. *Protection of Meter Accuracy* (omitted).

"ARTICLE IV. QUALITY. Section 1. *Quality of Gas* (omitted). Section 2. *Penalty for Failure of Quality* (omitted).

"ARTICLE V. DELIVERY PRESSURE AND POINT OF DELIVERY. Section 1. *Delivery Pressure.* Delivery of natural gas hereunder shall be made by Republic at the highest pressure which can be efficiently maintained by the natural pressure of gas from wells connected to Republic's gathering system, provided, however, that so long as the weighted average field pressure of the wells from which gas is at the time being delivered hereunder shall exceed one hundred fifty (150) pounds, the delivery pressure shall not be less than one hundred (100) pounds to the square inch. In the event that the weighted average field pressure of the wells from which gas is at the time being delivered

hereunder shall fall to one hundred fifty (150) pounds (or less) said required delivery pressure may be reduced to not less than fifty (50) pounds per square inch.

"Section 2. *Gathering System to be Maintained in Aid of Pressures.* Republic's gathering system shall at all times be maintained, and extensions thereof shall be so designed and maintained, as to deliver gas to Northern through pipe lines of ample size to conform to good practice so that the pressure drops through said lines from wells to point of delivery to Northern shall be as small as practicable.

"Section 3. *Delivery Point.* Delivery of natural gas hereunder shall be made in the Northwest Quarter (NW ¼) of Section 19, Township 33 South, Range 36 West, in Stevens County, Kansas, at the point where the gathering facilities of Republic interconnect with the pipeline system of Northern.

"ARTICLE VI. REPUBLIC'S RIGHT TO AUDIT CERTAIN RECORDS OF NORTHERN. Section 1. *As to Volume of Gas Applicable to 'Omaha District'* (omitted).

"Section 2. *As to Gasoline Extracted* (omitted).

"ARTICLE VII. DEDICATION OF LEASEHOLD ESTATES AND GATHERING FACILITIES. Section 1. *Dedication of Gas Acreage.* Republic agrees that from and after the effective date of this contract, all of its gas rights in the gas lands and gas leases set forth and described in Exhibit A, which is hereto attached and made a part hereof (covering approximately 76,800.35 acres, of which 75,000 acres shall at all times during the effective period of this contract constitute the minimum reserve hereunder) shall, subject to the rights of substitution and withdrawal under the terms and limitations hereinafter set forth, constitute a gas reserve which shall be, and is hereby dedicated to the fulfillment of this gas purchase contract; that said Exhibit A correctly describes the gas lands and gas leases in which the gas rights that are dedicated to the fulfillment of this contract exists; and that said gas rights in said gas lands and gas leases described in Exhibit A shall at all times during the life of this contract be impressed with said dedication; provided, however, that: Subsections (a), (b) and (c) omitted. Section 2. *Title to Developed Acreage* (omitted). Section 3. *Title to Undeveloped Acreage* (omitted).

"Section 4. *Dedication of Gathering System and Appurtenant Facilities.* Republic agrees that from and after the effective date of this contract that part of its natural gas gathering system and appurtenant equipment as presently constructed and located in Stevens and Morton Counties, Kansas, together with all gas wells now drilled, and those which may hereafter be drilled, on the dedicated acreage (set forth in Exhibit A), and the lines used to connect such wells to said gathering system, and all replacements, improvements, additions to and betterments of said gathering system, wells, and appurtenant facilities, shall be, and the same are hereby, dedicated to the fulfillment of this contract. . . . Section 5. *Title to Dedicated Facilities* (omitted).

"Section 6. *Dedication to Be Exclusive.* It is contemplated by the parties that the gas acreage dedicated under the provisions of Section 1 of this Article VII and the gathering system and appurtenant facilities dedicated under Section 4 of this Article VII shall at all times during the effective period of this contract be exclusively devoted to and used in the production, gathering and delivery of gas by Republic to Northern in the performance and fulfillment of

this contract, and Republic covenants and agrees that it will not sell gas produced from any of the dedicated acreage (so long as the same remains dedicated) to any party other than Northern, and that it will not use, or suffer, or permit, any of the dedicated gathering system and appurtenant facilities to be used in connection with any sale or delivery of gas to any party other than Northern. Subsections (a) and (b) omitted. Section 7. *Republic's Obligation to Protect Dedication* (omitted).

"ARTICLE VIII. GAS SUPPLY AND OTHER PARTICULAR COVENANTS. Section 1. *Gas Supply.* The obligation of Northern to take or pay for a minimum of 12,500,000,000 cubic feet of gas in each annual period of this agreement (July 1st to June 30, inclusive), is conditioned upon Republic having available for Northern from wells connected to its said gathering system and owned by or subject to contract to Republic an open-flow capacity at all times during each such period of not less than 342,465,750 cubic feet of gas per day.

"Republic, subject to the foregoing provisions concerning connected open-flow capacity and subject to the conditions hereinafter stated, shall always have the right to supply sixty per centum (60%) of the aforesaid requirements of Northern up to a maximum of thirty-six billion five hundred million (36,500,-000,000) cubic feet per year so long as the open-flow capacity of said wells connected to Republic's said gathering system is at all times at least four times the average daily requirement of the four days on which Northern's requirements from Republic shall be the greatest in any thirty-day period, and Republic is able to make delivery of said amounts at the delivery pressure herein provided.

"It is understood and agreed that if at any time during the continuance of this contract, the open-flow capacity of said wells of. or subject to contract to Republic, connected with Republic's gathering system and available for Northern is less than four times the average daily requirement of the four days on which Northern's requirements hereunder from Republic shall be the greatest in any thirty-day period (meaning by Northern's said requirements hereunder sixty per centum of Northern's total maximum requirements for serving said Omaha District from its said pipe line, but not exceeding one hundred million cubic feet per day) and if Republic is not able within ninety days thereafter to cause to be developed, maintained and connected with its said gathering system wells owned by or subject to contract to Republic having an open-flow capacity of at least four times the average daily requirement of the four days on which Northern's said requirements hereunder from Republic shall be the greatest in any thirty-day period, then Republic's right to supply sixty per centum of Northern's said requirements shall cease, and in that event Northern is privileged to contract for and purchase an additional supply of gas elsewhere. Northern, however, does agree to take as nearly sixty per centum of its aforesaid requirements from Republic as Northern's conditions and gas purchase obligations contracted by it shall then permit. . . .

"Republic covenants and agrees that it will at all times maintain its gas wells in good condition and to use its best endeavors at all times to maintain a supply of gas adequate to meet Northern's aforesaid requirements under all conditions of this contract.

"Section 2. *Northern's Take in Case of Depletion.* Northern agrees that if, through depletion of the supply of gas in the 'Hugoton Area', or for other cause beyond its control, Republic is unable to deliver gas in the volumes specified and in the manner provided in this contract, Northern, nevertheless, will continue to purchase gas from Republic and Republic shall continue to sell and deliver gas until the supply in the 'Hugoton Area' is depleted or reduced to the extent that Republic, due to such depletion or other cause beyond its control, is unable to deliver at the pressures provided in Section 1 of Article V an average amount of five million (5,000,000) cubic feet per day during a period of six (6) consecutive months, in which event, Northern may at its election cancel this agreement.

"Section 3. *Parties to Facilitate Performance.* Each of the parties hereto expressly covenants and agrees with the other that it will at all times further and not obstruct the performance of the agreements, covenants and undertakings imposed upon the other party under this contract, and that each of the parties will fulfill and punctually perform and comply with each and all of their respective agreements, covenants and undertakings.

"Section 4. *Default.* It is covenanted and agreed that if either party shall fail to perform any of the obligations or observe and faithfully keep any of the covenants imposed upon it under and by virtue of this agreement, then in such event the other party may at its option terminate this agreement by proceeding as follows: The party not in default shall cause a written notice to be served on the party in default stating specifically the cause for terminating this agreement and declaring it to be the intention of the party giving the notice to terminate the same; thereupon the party in default shall have thirty (30) days after the service of the aforesaid notice in which to remedy or remove the cause or causes stated in the notice for terminating the agreement, and if within said period of thirty (30) days the party in default does so remove and remedy said cause or causes and fully indemnify the party not in default for any and all consequences of such breach, then such notice shall be withdrawn and this agreement shall continue in full force and effect. In case the party in default does not so remedy and remove the cause or causes or does not indemnify the party giving the notice for any and all consequences of such breach, within said period of thirty (30) days, then this agreement shall become null and void from and after the expiration of said period. Any cancellation of this agreement pursuant to the provisions of this Article shall be without prejudice to the right of Republic to collect any amounts then due them for natural gas delivered to the time of cancellation, and without waiver of any remedy to which the party not in default may be entitled for violations of this agreement. Section 5. *Sale of Properties to be Subject to Contract* (omitted).

"ARTICLE IX. TITLE TO GAS (omitted). ARTICLE X. LIABILITY OF PARTIES (omitted). ARTICLE XI. TERM OF CONTRACT. Subject to earlier termination under the provisions hereof, this agreement shall continue in force from the date hereof for a period of twenty (20) years, and thereafter so long as Republic shall have gas available for sale to Northern, as and to the extent provided in and subject to the terms and conditions of this agreement.

"ARTICLE XII. Miscellaneous. Section 1. *Notices* (omitted).

"Section 2. *Commission Jurisdiction.* This contract is subject to all valid legislation with respect to the subject matter hereof, either State or Federal, and to all valid present and future orders, rules and regulations of duly constituted authorities having jurisdiction.

"Section 3. *Assignment.* This contract, and each of its covenants and obligations, shall inure to the benefit of and be binding upon the successors, trustees and assigns of the respective parties hereto.

"Section 4. *Former Gas Purchase Contracts.* Republic and Northern mutually agree that this Contract is a simplified restatement of their contractual obligations as 'Seller' and 'Buyer' respectively, of natural gas from the Hugoton Gas Field, originating under and established by the Gas Purchase Contract dated May 27, 1930, and all agreements supplemental of and amendatory thereto, and as such supersedes and cancels said Contract of May 27, 1930."