REPUBLIC NATURAL GAS COMPANY, a Corporation, *Appellant,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Appellee.*

No. 38,631

NORTHERN NATURAL GAS COMPANY, a Corporation, *Appellant,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Appellee.*

(244 P. 2d 1196)

Opinion filed June 7, 1952.

*Gayle E. Stahl,* of Omaha, Neb., argued the cause and *Lawrence I. Shaw,* of Omaha, Neb., was with him on the briefs for the appellant, Northern Natural Gas Company; *Carl T. Smith,* of Wichita, argued the cause, and *George Siefkin, George B. Powers, Samuel E. Bartlett, John F. Eberhardt, Stuart R. Carter* and *Robert C. Foulston,* all of Wichita, and *J. S. Brollier,* of Hugoton, were with him on the briefs for the appellant, Republic Natural Gas Company.

*Jay Kyle,* general counsel, of Topeka, and *W. P. Wesley,* special counsel, of Ulysses, argued the cause and *H. W. Stubbs,* special counsel, of Ulysses, was with them on the briefs for the appellee.

The opinion of the court was delivered by

SMITH, J.: These are two appeals from judgments of the district court refusing to set aside orders of the corporation commission. They were consolidated here.

The controversies grow out of the activity of the corporation commission in administering G. S. 1949, 55-701 to 55-713, commonly known as the Natural Gas Conservation Statute. These sections were enacted as chapter 213 of the Session Laws of 1935, and re-enacted in their present form as chapter 233, Session Laws of 1945. As far as concerns this action, no change was made by the second enactment. The controversies. arise from what is known as the Hugoton Natural Gas field. This is an active, productive source of natural gas covering several counties in the southwest portion of this state. The appellants are active operators in the field. Northern operates a pipeline and some wells. Republic has a great many wells and sells all its gas to Northern, which it in turn transports and sells to widely scattered consumers.

A pertinent section of the act is G. S. 1949, 55-701. This section prohibits the production of natural gas in such a manner and under such conditions as to constitute waste. G. S. 1949, 55-702, defines waste. G. S. 1949, 55-703, confers on the commission the power to regulate the taking of natural gas from any common source of supply, and to prevent inequitable or unfair taking by any person or company. G. S. 1949, 55-704, confers on the commission power to make rules.

In carrying out the provisions of the statute the commission shortly after the taking effect of the act, gave notice and held hearings in the field, in which both Northern and Republic appeared and participated. One result of these hearings was the issuance by the commission of what is referred to generally in the field, and in this record as the "Basic Proration Order for the Hugoton Gas Field." No appeal was ever taken from this order and it has been used generally as a guide for all interested parties. Amongst other things, this provided that there should not be more than one well for each 640 acres except for the long and short sections. The order also provided for a formula by which the deliverability of each connected well in the field was to be determined. This was in accordance with a portion of G. S. 1949, 55-703, where it is provided:

"In promulgating rules, regulations and formulas, to attain such results the commission shall give equitable consideration to acreage, pressure, open flow, porosity, permeability and thickness of pay, and such other factors, conditions and circumstances as may exist in the common source of supply under consideration at the time, as may be pertinent: . . ."

The result of applying this formula was that each well in the field was assigned what is referred to as an "allowable." We are especially interested in paragraph (p) of this basin order. It reads as follows:

"Operators of wells and purchasers, or others taking gas from any well, shall endeavor to limit their takes of gas to the quantities fixed in the schedule as the allowable production for such well, provided that, if, during the period covered by any schedule there should develop a substantial increase in the amount of the market demand for gas from said field, the Director may permit production to be increased ratably from all the wells in the field to meet such emergency increased demand and the facts respecting same shall be reported to the Commission at or before the next periodic market demand hearing for such action thereon as may be proper. If, at the end of any proration period, there is an overage or underage in production for any well during such period, same shall be carried forward as a charge against or credit in favor of such well and subtracted from or added to, as the case may be, the allowable for such well for the next proration period. Any overage in production from any well during any proration period which is not equalized by ratable overages from all other wells in the field or which is not compensated for in the allowables fixed for other wells in the field for the next succeeding proration period or not otherwise made up within one year after the proration period in which it occurred, shall constitute illegal overproduction from such well and such well shall be shut in until such overage is thereby fully made up. All wells with an overproduction of three times the amount of their current month's allowable shall be shut in by the operator or producer and not permitted to produce any gas until such overproduction has been fully absorbed by deductions from such overproduction made by current allowables. When any connected well has accumulated an underage in excess of three times its allowable for the current month, such excess shall thereupon be canceled and the amount so canceled shall be spread among all the wells of the field. Any underage so canceled shall not be considered in the determining of the future production of any such well, unless, upon notice and hearing, the Commission shall otherwise determine: *Provided, however,* That in no event shall any underproduction of an unconnected well be canceled."

It will be noted the commission evidently realized no operator could take the exact amount fixed for any well for any period, so a certain amount of elasticity was provided for by the provision as follows:

"If, at the end of any proration period, there is an overage or underage in production for any well during such period, same shall be carried forward as

a charge against or credit in favor of such well and subtracted from or added to, as the case may be, the allowable for such well for the next proration period."

We are especially interested in the final provision of paragraph (p):

"When any connected well has accumulated an underage in excess of three times its allowable for the current month, such excess shall thereupon be canceled and the amount so canceled shall be spread among all the wells of the field. Any underage so canceled shall not be considered in the determining of the future production of any such well, unless, upon notice and hearing, the Commission shall otherwise determine:"

Some wells of the Republic and of Northern had accumulated such an amount of underage which had been canceled, as per the above provision.

G. S. 1949, 55-706, provides that any interested party may by petition institute proceedings before the commission upon any question relating to the enforcement of the act or the promulgation, revocation, amendment, renewal, interpretation, extension or enforcement of any rule, regulation or order of the commission. These proceedings were begun by filing such a petition, by Republic. Northern intervened.

The Republic petition alleged first that it was a producer of gas in the Hugoton field and all gas produced from its wells was sold to the Northern Natural Gas Company; that hearings were held on January 2, 1947, by the commission concerning the reinstatement of canceled under production in the Hugoton field, which disclosed that the canceled underproduction of Republic was 3,368,849,000 cubic feet; that Republic had been ordered to shut in sixty-three of its wells for over production; that Republic, together with other producers in the field, requested that the canceled underage be reinstated; that such gas was urgently needed to supply the market demand of Northern, which company would purchase it; that demand for gas from the Kansas portion of the Hugoton field had increased; that anticipating such demand Republic was given permission by the commission to drill and was in the process of drilling twenty-nine additional wells; that for the purpose of permitting wells from which allowed production had been canceled to currently proportionately produce with other wells in the Hugoton field it was necessary that the canceled allowed production be permitted to produce; that it was necessary the relief asked be granted for the purpose of supplying gas to the ultimate consumers; that

Northern had a market for such canceled overproduction; that the commission had received in evidence a complete record of the facts showing Republic's canceled under production and unless the relief prayed for was granted the Republic and others similarly situated would be denied the equal protection of the laws; that it was necessary that the commission act at once.

The application of Northern Natural Gas Company for leave to intervene alleged it produced and purchased large volumes of gas from the Hugoton field; that all the gas produced from the wells of the Republic was purchased by Northern; that Northern had a market and the facilities for taking the previously canceled under production of gas from all the wells of Republic; that in order to permit each developed lease of Republic to ultimately produce approximately the amount of gas underlying such lease on April 1, 1944, and to currently produce proportionately with other developed leases in the Hugoton field without uncompensated cognizable drainage and in order to permit Republic to produce that portion of all gas that may be currently produced without waste and to satisfy the market demands therefor, it was necessary that all the allowable production previously canceled by the commission be reconsidered by the commission and allowed to be produced; that unless this was done Republic and all others similarly situated would be deprived of the equal protection of the laws.

Prior to the filing of these petitions the commission on its own motion had instituted an investigation to determine the production status of natural gas wells in the field with respect to accumulated underages and to determine whether or not existing rules governing the cancellation of underages should be amended.

The commission set the two petitions and its own investigation down and conducted hearings at various times. At these hearings witnesses for Republic and Northern appeared and testified as well as witnesses for other producers in the field.

At the conclusion of these hearings the commission found as to its own investigation that neither the public welfare nor the interest of the various individuals, landowners, royalty owners, operators, producers and pipe-line companies, will be generally advanced by changes in the rules and regulations embodied in the Basic Proration Order.

As to the petition of Republic, the commission found after reciting the hearings and appearances that it had promulgated the

basic order and it was in effect since March 1, 1944; the order then quoted part of paragraph (p):

"When any connected well has accumulated an underage in excess of three times its allowable for the current month, such excess shall thereupon be canceled and the amount so canceled shall be spread among all the wells of the field. Any underage so canceled shall not be considered in the determining of the future production of any such well, unless, upon notice and hearing, the Commission shall otherwise determine: *Provided, however,* That in no event shall any underproduction of an unconnected well be canceled."

It further found the records showed the underage of wells of Republic that had been canceled pursuant to the above paragraph; that the petition was for the reinstatement of these underages; that the basic order contemplated by the adoption of production allowables, the right to take gas from each well predicated only upon the schedule of production allowables authorized by the commission for a given period; that the basic order did not contemplate the granting of allowables to be construed as a vested property right or that the right to withdraw gas under any schedule of allowables for a given proration period as being continuing or to confer the right to withdraw gas at some later period not included in the schedule of allowables; that to grant the application would cause waste, invade correlative rights, would not be conducive to the orderly development of the field and was, therefore, contrary to the statutes and the basic order. The prayer of the petition was denied.

As to the petition of Northern, the order made about the same findings and denied the petition. In due time Republic and Northern both filed petitions for rehearing. These petitions were granted and other hearings held, after which the relief prayed for by both of the companies was again denied.

The Republic and the Northern both filed actions for judicial review in accordance with the provisions of G. S. 1949, 55-707. This section refers to G. S. 1949, 55-606, which is the section having to do with appeals from the orders of the commission under the oil proration statutes. The section provides that an abstract of all of the record of evidence and proceedings before the commission shall be filed with the district court, and that the district court may remand the action of the commission for further consideration and the court shall not be bound by any findings of fact made by the commission but shall be limited to a judgment either affirming or setting aside in whole or in part the order of the commission and

that appeal to the Supreme Court may be taken from the judgment of the district court as in other civil actions. The trial court considered the record before the commission and found that the orders appealed from were lawful and reasonable; that they were before the court on a petition for review and should be upheld. Judgment was entered accordingly.

The motions for a new trial were on the ground that the order was contrary to law and unsupported by the evidence. These motions were overruled—hence this appeal.

The specifications of error are that the court erred in holding the orders to be lawful and reasonable; in erroneously interpreting the statutes, upon which the orders were based; that no constitutional or statutory power was granted the commission to deny to any producer of gas in a common source of supply the right to withdraw therefrom the well's equitable portion of the recorded production; that the orders contravened the provisions of G. S. 1949, 55-703; that they violated section 10, article 1 of the United States Constitution by impairing the obligation of a contract; that they violated section 18 of the Bill of Rights and the fourteenth amendment to the constitution by taking appellant's property without due process of law; that they denied appellants the equal protection of the law; that they were not a proper exercise of the police power; that the undisputed evidence showed no waste would have been committed, as contemplated by the provisions of the statute, by the granting of the relief requested by the appellants and that the granting of such relief was necessary for the protection of appellants' correlative rights in the field; that the orders transcended public necessity and were unreasonable and unlawful; that they constituted an unwarranted discrimination between producers in the Hugoton field and were, therefore, unlawful; that appellants were possessed of a vested right to produce the volume of gas in controversy; that the trial court erred in admitting and in considering on behalf of the commission incompetent and prejudicial evidence over the objection of the appellants; that the trial court erred in refusing to weigh the evidence produced by the record; in overruling appellants' motion for a new trial and in assessing the cost of the review to appellants.

Notwithstanding the foregoing specifications of error, Republic states the questions involved to be two:

"1. Whether there is a continuing duty upon the State Corporation Commission of the State of Kansas to so conduct the control of production of

natural gas from the Kansas Hugoton Field under the provisions of the controlling statute (Chapter 233 of Laws of 1945, G. S. Kan. 1949, Ch. 55, Art. 7) so as to continue the ratable taking by all of the wells therein, with due regard to conditions or circumstances that result in an unintended discrimination against a producer; and, if any rule or action of the Commission, though well founded in purpose, results in discrimination against a producer, then upon application of such producer does the Commission have the authority to remove and correct such discrimination.

"2. Whether the State Corporation Commission of the State of Kansas, in pursuance of the statutes authorizing it to regulate the production of natural gas for the prevention of waste and the protection of correlative rights, can, under the guise of preventing waste and protection of correlative rights, by its orders which in fact do not prevent waste, or protect correlative rights, take away from appellant herein its property and property rights in its right to produce natural gas and in its private marketing contract, and confer the same on others who have no interest therein."

Republic argues first the denial of Republic's application cannot be upheld or justified on any theory of prevention of waste or of protecting the correlative rights of other producers in the field. At the outset of Republic's argument it makes the statement:

"We readily concede the state's power to require ratable taking to enforce correlative rights by a proper order in a proper case."

It then proceeds to point out a definition of the term "correlative rights" set forth by the commission in a basic order having to do with oil proration and approved in *Aylward Production Corp. v. Corporation Commission,* 162 Kan. 428, 176 P. 2d 861. It is as follows:

"Correlative rights shall mean that each owner or producer in a common source of supply is privileged to produce therefrom only in such manner or amount as not to injure the reservoir to the detriment of others or to take an undue proportion of the oil or gas obtainable therefrom, or to cause undue drainage between developed leases."

They argue the granting of Republic's petition would not have been an invasion of the "correlative rights" of other producers in the field because it would not have deprived them of their fair share of the gas produced from the field because they had previously received their fair share of the gas produced from the field.

This argument fails to take into consideration the time element in proration. By the very nature of the business of conserving the gas supply the time element must be considered. Actually the legislature recognized this when it provided:

". . . That the daily take of gas from any well shall not exceed 25 percent of its open flow:" (See G. S. 1949, 55-703.)

Another provision of the same section is:

".  .  .  Then any person, firm or corporation having the right to produce natural gas therefrom, may produce only such portion of all the natural gas that may be currently produced without waste and to satisfy the market demands,  .  .  ."

"Currently" as used in the above must have referred to some period of time.

The commission in issuing its basic order treated the matter as a problem where the flow of gas must be limited by months. No appeal was taken from this order and it has been the rule and guide of all parties in the field since it became effective.

In *Northern Natural Gas Co. v. Republic Natural Gas Co.*, 172 Kan. 450, 241 P. 2d 708, we dealt with another angle of this matter of overages and underages of wells. We said in referring to certain provisions of paragraph (p):

"Perhaps these provisions were inserted because of the difficulties operators would encounter in attempting to hold production of their wells to the specific allowables named by the Commission and to afford a workable leeway. Certainly they were not designed to nullify the provisions in the earlier part of the paragraph."

It could have been stated more positively. Clearly paragraph (p) was placed in the basic order by the commission because of the difficulty, as a practical matter, involved in causing a well to produce exactly its allowable each month, no more, no less. The first sentence is a direction to its operator to endeavor to limit the intake of gas to the quantities fixed in the schedule. This provision had the force of a positive direction. (See *Northern Natural Gas Co. v. Republic Natural Gas Co.*, supra.) There we quoted that rule and said:

"This is the basic rule which governs Republic's operation of its wells."

Naturally the commission realized it would be a physical impossibility for the operators to check each well so closely as to take exactly the allowable in any one month—hence the provisions for carrying forward the overages and underages. The arrangement is clearly a cushion to make the whole plan workable. The commission must have foreseen some such a situation as we have here—hence the provision that once these accentuated underages had reached a point where they amounted to three times the current allowable for any well they should be canceled. Had this provision not been in paragraph (p) any operator could have permitted

underage to pile up waiting for a more attractive market and the whole plan of proration would have been destroyed.

In *Northern Natural Gas Co. v. Republic Natural Gas Co.,* supra, Republic made an argument somewhat similar to this when it contended that overproduction was not unlawful until it amounted to three times the allowable for a given well. We held this was not true We said:

"The theory is wrong. The allowable for each well is the amount stated by the commission as allowed to it,—not 2.99 times such amount."

Republic refers to the opinion of the commission where it is said:

"To justify the invasion of correlative rights of others by permitting them to withdraw canceled underage production predicated on markets long expired, and divert such canceled underages to new allowed production along with their current allowable production."

The argument then is made that such a position is fallacious for the reason the first one being the "correlative right" of a producer in a common source of supply is the right to secure his fair share of the restricted production produced from the reservoir—not to participate in any given market. In this statement Republic shows the fallacy of its position in these appeals. The market in which the producer has a right to participate is a "given market." It is the current market upon which each month's allowables are based. The statute contemplated this when the words "currently produce" in G. S. 1949, 55-703, were used. The commission realized it when acting pursuant to the basic order, including paragraph (p) was promulgated. There is nothing hard and fast, unreasonable or arbitrary about the cancellation of accumulated underages. The next to the last sentence of paragraph (p) is:

"Any underage so canceled shall not be considered in the determining of the future production of any such well, unless, upon notice and hearing, the Commission shall otherwise determine:"

The entire matter, not of the cancellation, but of what effect the cancellation shall have on the future production of any well is a matter addressed to the judgment and discretion of the commission after a hearing. One thing is clear, the market for which a producer has a right to produce his allowable for any given month is the allowable for that month.

Republic argues further the petition did not request any additional allowable be assigned its wells. It only requested that the commission secure to its wells the right to obtain their fair share of the

restricted production by offsetting canceled underage against overage. The first statement is hardly correct. The underage was not canceled until it amounted to three times the current allowable for a given month. Just how this underage could be restored without increasing the amount of gas Republic wells would be allowed to produce monthly, which would amount to an increase in the allowable, does not readily appear. As to the underages being reinstated as a means of offsetting canceled underages against overages we held that this overage was unlawful. (See *Northern Natural Gas Co. v. Republic Natural Gas Co.*, supra.) Republic makes the categorical statement:

"No evidence was offered, indeed it was not even claimed that the granting of the application would, in the slightest degree, contribute to the creation of waste."

It is difficult to understand why such statement is made in a brief. Mr. Hinton, who testified at the hearings, is chief production engineer and superintendent of Panhandle, a company operating in the field. He testified, amongst other things:

"Q. Do you have any further statement in connection with that or any of these exhibits at this time, Mr. Hinton? A. The only thing that I have to comment is I believe we have now had some education in proration. If the cancellation of underage would be allowed by this Commission that it would be impossible for any company operating in that field to develop in an orderly manner because, if a company could continue to develop when it had excessive allowables it would mean that the other companies operating in the field would have to develop to meet the rate set by that company."

If a condition was allowed to prevail that would make it impossible for any company operating the field to develop in an orderly manner, the result would be waste, as defined by the statute.

In regard to the first question propounded by Republic, we have concluded that there is a continuing duty on the part of the commission to cause the taking of gas from any well to be ratable and to be taken in accordance with the provisions of the statute and the basic order.

In regard to the second question propounded by Republic, we have concluded no operator has any vested right to take from any well more gas in any month than is assigned it as its allowable, and the entire matter of taking gas from a well is subject to the provisions of the basic order and the statute.

What we have just said applies with equal force to the arguments of Northern.

It follows the order of the commission from which the appeal was taken to the district court was legal and reasonable.

The judgment of the trial court is affirmed.