No. 42,128

NORTHERN NATURAL GAS COMPANY, *Appellant,* v. STATE CORPORATION COMMISSION, *Appellee.*

(362 P. 2d 599)

Opinion filed June 10, 1961.

*Mark H. Adams, II,* of Wichita argued the cause, and *Mark H. Adams, Charles E. Jones, William I. Robinson, J. Ashford Manka, Clifford L. Malone, John S. Seeber* and *Floyd E. Jensen* of Wichita; *Lawrence I. Shaw, F. Vinson Roach,* and *Patrick J. McCarthy* of Omaha, Nebraska; *Ray H. Calihan, Logan N. Green, Daniel R. Hopkins* and *Ray H. Calihan, Jr.,* of Garden City were with him on the briefs for the appellant.

*Charles C. McCarter*, general counsel, argued the cause, and *S. F. Fleeker*, assistant general counsel, was with him on the briefs for the appellee.

The opinion of the court was delivered by

JACKSON, J.: The appellant Northern Natural Gas Company began a judicial review action in the court below to review an order of the Corporation Commission directing it to take gas ratably from all gas wells in the Kansas Hugoton Gas Field to which its lines were connected including the gas wells owned by Republic Natural Gas Company with which company it had a special contract as to the purchase of gas. The district court affirmed the order of the Commission, and the appellant brings the matter to this court on an appeal from the district court's decision.

Throughout the remainder of this opinion we shall refer to the above parties as "Northern," "Republic," and the "Commission."

For many years Northern and Republic have been parties to a contract under which Northern agreed to take and pay for a sufficient amount of natural gas to supply 60 percent of the supply needed by Northern to satisfy the needs of its customers in a certain area in Iowa and Nebraska. The exact location of this area in Nebraska and Iowa is not important, but it is referred to in the briefs as the Omaha District. This contract covers only some 144 wells owned by Republic and in the briefs this group of wells is referred to as the "Republic A" wells.

The above contract has been before this court in the former case of *Northern Natural Gas Co. v. Republic Natural Gas Co.*, 172 Kan. 450, 241 P. 2d 708, in which opinion a more detailed account of the contract may be found.

There can be no question that Northern is engaged in the interstate transportation of natural gas by pipe line for sale in states other than Kansas, as defined in the Natural Gas Act. In the last case mentioned, the question at issue was the amount of gas which could be lawfully produced under the above contract and regulations of the Commission. The important part of the syllabus of the case just cited reads: "An operator of gas wells . . . as to the amount of gas he can produce from the wells, is governed by the allowables for such wells made by the commission for the time in question and not by slightly less than three times such allowables."

Another case which is connected with this same contract between Republic and Northern is that of *Republic Natural Gas Co. v. State Corporation Commission*, 173 Kan. 172, 244 P. 2d 1196. Those inter-

ested in an account of the manner of establishing proration allowables for gas wells in the Hugoton field are directed to the opinion in the last mentioned case. The case affirmed the Commission in making an order refusing to reinstate canceled "underages" of certain gas wells owned by Republic. The canceled underages had been canceled according to the rules of the Commission applying to the entire Hugoton field.

As early as 1938, Northern had begun to purchase additional gas supply in the Hugoton field in addition to the Republic "A" wells. In 1949, Northern entered into a gas purchase contract with Cities Service Oil Company. Thereafter, Northern purchased other gas supply and now owns some 125 gas purchase contracts.

These gas purchase contracts cover a total of some 1,100 gas wells in the Hugoton field. Such contracts contain provisions for the ratable taking of gas between all gas wells with the exception that Republic "A" wells are specifically excepted from the provision for ratable taking and are given preference where the demand for gas does not equal the allowables for all of the wells. A copy of such contracts is contained in the abstract but need not be reproduced in this opinion.

Northern's position is quite clearly and forcefully stated in the following quotation taken from its brief:

"As Northern has interpreted its commitments under its gas purchase contracts in such field, when Northern's market requirements from the field are less than the total allowables assigned to the wells connected to Northern, Northern's contractual commitment (as previously interpreted by the Court) under the Republic "A" contract is first deducted from Northern's gas requirements and allocated to the Republic "A" wells. The balance of Northern's requirements is then allocated ratably to all other wells to it connected in such Field."

Northern further tells us that from 1944 until 1958, Northern was largely able to take ratably from all wells connected with its lines, but it seems to concede that during 1958, it took gas from Republic "A" wells at a much greater rate than from the rest of the wells connected to its gathering lines. In January, 1959, the Cities Service wells connected to Northern's lines had a monthly allowable of 2,084,874 Mcf. They had an underage of 11,411,727 Mcf., and 123,711 Mcf. of these underages were canceled by the Commission under its general rules as being underproduced in excess of six times the January current allowable. Northern's other connections aside from Republic "A" wells had a January current allowable of

9,309,441 Mcf. and a total underage of 48,604,070 Mcf. The net status of these wells was 522.09 percent underproduced, and they suffered cancellation of 409,393 Mcf. of the aforementioned underage.

In contrast, Republic "A" wells had a current January allowable of 2,674,390 Mcf. and an overage of 114,858 Mcf. They were over-produced 4.29 percent in that particular month.

Northern makes no claim that it would not have been possible to take gas ratably from all of its wells. It only claims that the contract with Republic gives it the right to prefer Republic "A" wells.

On May 27, 1959, the Commission on its own motion took notice of the above situation and issued an order to Northern to show cause why it should not take ratably from the wells to which it is connected in the Hugoton field in Kansas. The hearing was set first on June 26, 1959, but later continued to July 24, 1959, and the order appealed from was issued October 7, 1959.

At the hearing before the Commission, an expert witness testified as follows:

". . . I have expressed an opinion that there is drainage occurring. Our studies indicate that if the wells are produced with the same percent of allowable production or of net allowable production, then the wells will be ratable, and correlative rights will be protected. There are two ways of accomplishing this currently in the Hugoton Field. One is to raise the total (of) Northern Natural's takes up until they are ratable with the Republic 'A' group, and second would be to lower Republic 'A' by curtailing their production, so they will become ratable with the balance of the field."

We do not read the record to show that there is any contention but that drainage was occurring, and that the underproduced wells were losing the right to produce gas from the common source of supply to the great damage of the owners of the wells in the loss of their correlative rights.

While the members of this court make no claim to be experts in the science of the production of natural gas, we believe that the court may take judicial notice of the fact that where natural gas is within the earth in one common source and is under pressure, if one gas well is allowed to take gas, this will result in the pressure being lowered around the vicinity of this gas well so that the gas in the common source will tend to drain or rush to the vicinity of the well taking gas. The result will be that the other wells in the common field or source will be able to produce much less gas and the owners of such wells will have suffered a definite loss.

It should be noted at this time that shortly after the issuance of the order of the Commission dated October 7, 1959, directed only to Northern and which is appealed from in this present proceeding, the Commission, after due notice and hearing, issued a general rule applicable to all takers of natural gas from the Hugoton gas field requiring that all takers of gas take ratably from the wells to which they are connected. Northern's appeal from that general order is to be found in *Northern Natural Gas Co. v. State Corporation Commission*, 188 Kan. 351, 362 P. 2d 609.

In attempting to sustain its position in the present case, Northern first contends that our state Natural Gas Act does not provide for ratable taking; that the act applies only to producers of gas; that Northern is a purchaser of gas and a natural gas company engaged in interstate commerce. It refers to section 55-703, G. S. 1959 Supp., and stresses the first part of the section which refers to producers. But Northern has ignored the latter part of the section wherein the following language is found:

"The commission shall so regulate the taking of natural gas from any and all such common sources of supply within this state as to prevent the inequitable or unfair taking from such common source of supply by any person, firm or corporation and to prevent unreasonable discrimination in favor of or against any producer in any such common source of supply. In promulgating rules, regulations and formulas, to attain such results the commission shall give equitable consideration to acreage, pressure, open flow, porosity, permeability and thickness of pay, and such other factors, conditions and circumstances as may exist in the common source of supply under consideration at the time, as may be pertinent."

In Summers on *Oil and Gas*, Vol. 1A, sec. 103.1 p. 139, wherein the eminent author is dealing with ratable taking of oil and gas, that part of section 55-703 set out above is noted and the author concludes as follows:

"The Kansas gas conservation act authorizes the state corporation commission to so regulate the taking of gas from any common source of supply as to prevent inequitable and unfair taking. This act does not expressly state that purchasers of gas in the common source of supply may be required to take ratably from all wells with which their pipe lines may be connected, *but unless the commission has such authority it cannot prevent inequitable and unfair taking.*" (Italics supplied.)

It will be noted that the Commission is authorized to make rules and regulations for the purpose of accomplishing the results to which the Commission is directed; and that such rules and regulations have

the force and effect of law when filed in the office of the revisor of statutes ( G. S. 1949, 77-410).

In search of Commission's Rule 82-2-101, which has been so filed, we find the following: "Taker: See purchaser." And in the same rule, purchaser is defined as follows:

"Purchaser shall mean any person who directly or indirectly purchases, transports, takes, or otherwise removes production to his account from a well, lease or common source of supply. Purchaser is usually considered to be the person holding the division order." (Italics supplied.)

We believe Northern is mistaken in arguing that the above statute and the rules made thereunder do not apply to a purchaser of natural gas. We are only more convinced that the legislature had this in mind by the fact that natural gas cannot be produced unless someone is ready to buy it, it cannot be stored in a tank on the lease. Therefore, as Professor Summers says, the object of the quoted provisions of section 55-703 cannot be accomplished unless the taker or purchaser can be controlled. We believe the statute is sufficient to reach Northern.

We note that in its brief, the Commission has directed attention to certain language in the opinion of *Republic Natural Gas Co. v. State Corporation Commission,* supra. While the whole opinion in that case is in line with what we are now deciding, the precise question now before us was not there involved.

The second objection to the validity of the order of the Commission appealed from is sweeping in its coverage and reads as follows:

"II

"Said order as approved by the trial court is arbitrary, unreasonable and discriminatory, has no relation to proration or conservation of gas, burdens interstate commerce and takes appellant's property and contract rights, all in violation of the commerce clause, the contract clause and the fourteenth amendment to the federal constitution, and the Kansas Bill of Rights, sections one, two and eighteen, and section seventeen, article two of the Kansas constitution."

Despite the sweeping indictment of the order, Northern really seems to simply argue that the contract has established the correlative rights of the parties, and that therefore, the state is powerless to prevent waste and drainage of gas as long as the monthly allowables are not unlawfully exceeded.

We would direct attention to a provision of the contract upon which Northern relies, and which reads:

"Section 2. *Commission Jurisdiction.* This contract is subject to all valid legislation with respect to the subject matter hereof, either State or Federal, and to all valid present and future orders, rules and regulations of duly constituted authorities having jurisdiction."

We cannot agree with the argument that the monthly allowable is the whole story. Certainly, the wells attached to Northern and apart from Republic "A" are losing gas to Republic "A" and possibly to any other taker who is taking gas at a greater rate than Northern is allowing gas to be produced from these wells.

It would seem that ratable taking in the production of natural gas has been late in coming before this court for approval. The Supreme Court of Oklahoma upheld an order of the Corporation Commission of that state providing that a purchaser of natural gas must take gas from a producer having no contract with the purchaser and must also take ratably from the aforesaid producer; see *Cities Service Gas Co. v. Peerless Oil and Gas Co.*, 203 Okla. 35, 220 P. 2d 279, affirmed on appeal, 340 U. S. 179, 95 L. Ed. 190, 71 S. Ct. 215.

It would appear to us that the opinions of the Supreme Court of Oklahoma and of the Supreme Court of the United States in the above case foreclose any of Northern's arguments in the case at bar. There was a matter of contract involved in the Peerless case. Cities Service undoubtedly thought they had a right to take gas from the wells from which it had contracted to buy gas, and that it had no duty to contract with Peerless. But it was held that the state might prevent drainage of gas from the Peerless wells despite the contracts held by Cities Service.

Certainly, in view of the above quoted provision of the contract between Northern and Republic, there has been no impairment of the obligation of contract in this case or any other impairment of constitutional right.

Lastly, Northern contends that the order of the Commission impinges upon the authority of the Federal Power Commission under the Natural Gas Act, 15 U. S. C. A. § 717 *et seq.*

As above noted, we are quite well aware that Northern is engaged in the transportation and sale of natural gas in interstate commerce by pipe line. We do not believe, however, that the matters dealt with in this case affect interstate transportation or sale in any respect. That is, the matters dealt with in this case pertain to "production and gathering of natural gas." (15 U. S. C. A. § 717(b)).

It should again be emphasized that the Commission's order did not direct Northern as to the amount of gas which it should take, it only directed that the amount Northern needs shall be taken ratably from all the gas wells which Northern serves. Northern agrees that it could do this, but says it would have to give up its contracted preference to Republic "A" wells. Everyone would be happy if Northern would take the entire monthly allowable from all of the wells served. Northern says that in the near future it believes that it will be able to do this very thing.

We believe that the state may regulate the production of natural gas and the gathering of the same to the extent necessary to insure that the gas under one owner's land will not be drawn off by his neighbor, and that his neighbor cannot plead a contract with a third person to give him a right to drain gas from his neighbor.

All of the matters contained in Northern's brief have been fully considered, and we find that the order appealed from must be affirmed. It is hereby so ordered.

SCHROEDER, J. (dissenting): The Commission by its order directed to Northern assumes it has authority under G. S. 1949, 55-703, as amended, to control and regulate *purchases* of gas by Northern, engaged in the interstate transportation of gas. This, in my opinion, is beyond the authority of the statute.

What the Commission in the instant case (No. 42,128), and in the companion case (No. 42,127), purports to do is to set up one proration system, having application to *purchasers*, within a proration system controlling *production* under the Basic Order for the Hugoton Gas Field adopted on the 21st day of March, 1944, *which was designed and declared by the Commission to "accomplish the purposes for which article 7, chapter 55, General Statutes of Kansas for 1935 was enacted."* (Basic Proration Order for the Hugoton Gas Field, paragraph m.) (Emphasis added.)

By the Commission's order dated October 7, 1959, Northern was directed to take gas ratably from its connections in the Kansas Hugoton Gas Field (Case No. 42,128), and by the Commission's order promulgating Rule 8-2-219 (Case No. 42-127), all companies *purchasing gas* from a common source of supply under proration by the Commission are required to take gas in proportion to the allowables from all the wells to which each is connected.

The Basic Proration Order for the Hugoton Gas Field, as

amended, and in effect at times material, by a system of proration, controls the *production* of gas in the Hugoton Field. The end sought in fixing *production quotas* was to enable each developed lease to currently produce its daily allowable so that ultimately such developed lease would have an opportunity to produce approximately the amount of gas which underlies such lease. It recognized the available production of the wells in the Hugoton Field was far in excess of the market demand, and found:

"f. That since there exists disproportionate *production* from the wells and leases in said field which impairs the correlative rights of many of the owners of developed leases, it is necessary for the Commission to take jurisdiction and to prescribe *regulations for the production of gas* from said wells and others that may be hereafter completed in said field to the end that each person, firm, or corporation *having the right to drill into and produce natural gas from said field may take therefrom only such proportion of the amount that may be produced therefrom without waste* as will permit each well or developed lease *to produce* ultimately at least approximately the amount of gas underlying the land or lease on which such well is located and *currently produce proportionately* with the other wells in said fields . . ." (Emphasis added.)

The basic order adopted a formula which was said to have a reasonable relation to the prevention of waste, to the prevention of inequitable and unfair *production of gas from the common source of supply*, and to the prevention of unreasonable discrimination in favor of one *producer* in said field and against another *producer* therein (paragraph m). The order directed that there be held two market demand hearings for each year (paragraph n) to determine the market demand for natural gas from the Hugoton Field for the next succeeding proration periods, and directed the preparation and promulgation of a new schedule of *production* allowable for the wells in said field, *based upon the determination made as a result of the market demand hearing* (paragraph o).

The record presented discloses that pursuant to paragraph "n" of such basic proration order, two market demand hearings for each year were and are held by the Commission, and market demand orders were and are issued for six-month periods (October 1 to March 31 and April 1 to September 30), in addition to which *monthly proration or allowable orders were and are issued for each month spreading and allocating the market demand and fixing the monthly allowables assigned to each of the producing gas wells in said field.*

The record discloses that for the entire period from April, 1944, through February, 1958, there were no important differences be-

tween the ratable purchases by Northern from Republic "A" wells and other wells to which it was connected. The difference in ratio was less than one times the January allowable for essentially the entire period.

However, in the spring of 1958, a wide difference in Northern's purchases appears between the Republic "A" wells and the others.

The reason stated to the Commission and assigned by Northern for this difference is:

".  .  . First, as the Commission is well aware, *allowables granted by the Commission to the field have exceeded the total field production by approximately 130 billion cubic feet* and the wells connected to Northern, other than the Republic 'A' wells, have become substantially underproduced. Second, is the fact that Northern has been seriously delayed in expanding its system into new markets for gas by reason of the failure of the Federal Power Commission to issue the necessary Certificates of Public Convenience and Necessity.  .  ." (Emphasis added.)

Testimony on behalf of Northern was that given sufficient time it would be able to conduct its operations in such a way that the taking from the wells to which it was connected would be ratable. This was based *on the assumption that the Commission's future allowable assignments will be realistic,* and on the further assumption that the necessary expansion certificates will be issued to Northern by the Federal Power Commission.

It must be recognized that Northern's Republic "A" contract is subject to all valid legislation with respect to gas purchases in the Hugoton Field, either state or federal, and to all valid present and future orders, rules and regulations of duly constituted authorities having jurisdiction. (See, *Northern Natural Gas Co. v. Republic Natural Gas Co.,* 172 Kan. 450, 478, 241 P. 2d 708.)

The testimony on behalf of Northern was that as far as facilities were concerned, it was not physically impossible for Northern to take gas ratably from the Republic "A" wells and all other wells connected to its system. The evidence further disclosed that if the markets were sufficient so that Northern could take the current allowables from the Republic "A" wells and also take the current allowables from all other wells connected to it, then Northern's take would be ratable as between all wells connected to its system. In other words, *when the market conditions are at the same level as the allowables then the same return of take would exist between the Republic "A" wells and all other wells to which Northern was connected.*

Theoretically, when these facts are considered in the light of the Basic Proration Order for the Hugoton Field and the statute pursuant to which it was promulgated, if the Commission is not derelict in its duty *to correlate allowable production with the market demand,* all wells of necessity would be *produced* ratably without supplementation by any order or rule to control the *purchasers* of gas in the Hugoton Field. Taking into consideration the entire history of Northern's purchases of gas in the Hugoton Field starting from April, 1944, the above theory seems to have practical application.

It is readily apparent that any effort to control the purchase of gas, which of necessity on the facts before the court in the instant case is limited to those wells connected to Northern's gathering system and pipe line, cannot protect the correlative rights of all producers from the common source of supply in accordance with the mandate of the statute. It fails to take into consideration those wells, potentially capable of production, which have no market for their gas, and the differential in markets among the various purchasers of gas from the common source of supply. Therefore, if the Commission fails to exercise its power *to correlate production with demand,* it cannot accomplish the mandate of the statute, and resort to a method which requires *the purchasers* of gas in the Hugoton Field to take ratably from the wells to which each is connected is little more than a futile gesture.

It must be assumed the legislature was aware of the situation regarding the production and development of gas in this state when 55-703, *supra,* was first enacted in 1935, and when subsequent amendments were made thereto, but it did not expressly authorize the Commission to require purchasers of gas in the common source of supply to take ratably from all wells to which their pipe line was connected. It undoubtedly felt the control of production was sufficient to accomplish the purposes for which the statute was enacted.

An analysis of G. S. 1949, 55-703, as amended, (now G. S. 1959 Supp., 55-703) will disclose the Commission has no jurisdiction over purchases of gas by an interstate pipe line company. Our gas conservation law is Chapter 55, Article 7, and is entitled "PRODUCTION AND CONSERVATION OF NATURAL GAS." The applicable section of this statute is 55-703, *supra.* In pertinent part it reads:

"[1] Whenever the available *production* of natural gas from any common source of supply is in excess of the market demands for such gas from such common source of supply, or whenever the market demands for natural gas from any common source of supply can be fulfilled only by the production of natural gas therefrom under conditions constituting waste as herein defined, or whenever the commission finds and determines that the orderly development of, and production of natural gas from, any common source of supply requires the exercise of its jurisdiction, *then any person, firm or corporation having the right to produce natural gas therefrom, may produce only such portion of all the natural gas that may be currently produced* without waste and to satisfy the market demands, as will permit each developed lease to ultimately produce approximately the amount of gas underlying such developed lease and currently produce proportionately with other developed leases in said common source of supply without uncompensated cognizable drainage between separately-owned, developed leases or parts thereof. [2] The commission shall so *regulate the taking of natural gas from any and all such common sources of supply* within this state as to prevent the *inequitable or unfair taking from such common source of supply* by any person, firm or corporation and to prevent unreasonable discrimination in favor of any one common source of supply as against another and *in favor of or against any producer* in any such common source of supply . . ." (Emphasis and numbers added.)

In both cases the Commission relies upon the above quoted portion of the statute marked [2], categorically stating this is the source of its jurisdiction.

An examination of this portion of the statute, and those portions thereof which have been italicized, makes it clear that *the taking referred to,* over which the Commission is to have regulatory jurisdiction under certain circumstances, *is from the common source of supply.* As applied to the Kansas Hugoton Gas Field the common source of supply would be the so-called "Hugoton Pay Zone," or the producing horizon described as gas encountered at an average depth of from 2700 to 2800 feet below the surface within the Kansas Hugoton Gas Field. Therefore, the taking referred to is not a taking from the wellhead, or from a producer, or from the end of a gathering system owned by the producer some miles from the wellhead, but the taking referred to is from the common source of supply.

It must be noted the phrase "person, firm or corporation" used in both the first and second portions of the quoted statute, is defined in the first portion as one *"having the right to produce natural gas."* (Emphasis added.) It is difficult to believe the legislature intended that on the one hand such expression referred to a producer, and on the other hand to a purchaser.

The court in *White Eagle Oil Co. v. State Corporation Comm.,* 168 Kan. 548, 214 P. 2d 337, quotes a portion of the first sentence of the section of the statute in question which it construes as being the statutory mandate or declaration of public policy with regard to *production.*

While the Commission's general rules and regulations, in Rule 92-2-101, under the definition of "taker" refers the reader to the definition of "purchaser," the rules do not give the Commission jurisdiction to regulate purchases, unless such authority is found in the statute. In other words, if the statute does not confer power upon the Commission to regulate the purchases of gas, it cannot confer such power upon itself by the adoption of a rule.

The State Corporation Commission of Kansas has a limited jurisdiction. It possesses no powers not given it by statute. (*Bennett v. Corporation Commission,* 157 Kan. 589, 596, 142 P. 2d 810; *Manhattan Co. v. Commissioner,* 297 U. S. 129, 80 L. Ed. 528, 56 S. Ct. 397; 24 Am. Jur., Gas and Oil, § 144, p. 628; and see, *Texas & Pacific Ry. Co. v. U. S.,* 289 U. S. 627, 77 L. Ed. 1410, 53 S. Ct. 768.)

On those several occasions over the life of the statute when this court has been called upon to construe 55-703, *supra,* and its companion sections, it has consistently construed such act as a statute giving authority to regulate production, and not purchases. (*Northern Natural Gas Co. v. Republic Natural Gas Co.,* supra; and *Republic Natural Gas Co. v. State Corporation Commission,* 173 Kan. 172, 244 P. 2d 1196.)

In *Republic Natural Gas Co. v. State Corporation Commission,* supra, the court in substance said that the continuing duty on the part of the Commission was to cause the *production* of gas from any well to be ratable, in accordance with the provisions of the statute and the basic order; and that no operator or producer had any vested right to produce from any well more gas in any month than was assigned it as its allowable, the entire matter of *producing gas* from a well being subject to the provisions of the basic order and the statute. In other words, under 55-703, *supra,* to "take" gas means to "produce" gas. The essence of the gas conservation statute is that it operates on the operator or producer of the well.

In construing our oil conservation statute, which is very similar to our gas conservation statute, this court in *State, ex rel., v. Sinclair Pipe Line Co.,* 180 Kan. 425, 304 P. 2d 930, stated:

"The statutes with reference to waste are G. S. 1949, 55-601 to 55-608, inclusive. The production of crude oil in such a manner as to constitute waste

is prohibited by G. S. 1949, 55-601, and made a crime by G. S. 1949, 55-607. *The statute refers only to production.* Sinclair, as we have demonstrated, is engaged strictly in interstate transportation of crude oil. The Oklahoma statute on waste is almost identical to ours. In speaking of that statute, the supreme court of the United States held in *Champlin Rfg. Co. v. Corporation Commission,* 286 U. S. 210, 76 L. ed. 1062, 52 S. Ct. 559:

" 'It is clear that the regulations prescribed and authorized by the Act and the proration established by the commission apply only to production and not to sales or transportation of crude oil or its products.' " (pp. 437, 438.) (Emphasis added.)

It is significant to note that the oil statute, G. S. 1949, 55-603, states in part: ". . . . *any person having the right to drill into and produce* oil therefrom may *take* therefrom . . ." (Emphasis added.) (See, Two Cases on Conservation, Vol. 6, J. B. K. p. 149, by H. H. Lesar.)

It is apparent that heretofore the Commission itself has always construed the statute in question as one authorizing the regulation of production, and not purchases. In paragraph "f" of the Basic Proration Order for the Hugoton Gas Field the Commission found "The present and past *production* from the wells in said field is and has been *inequitable* and *unfair.*" (Emphasis added.) At another place in paragraph "f" the Commission found "it is necessary for the Commission to take jurisdiction and to prescribe regulations for the *production* of gas." (Emphasis added.)

In *Cities Service Gas Co. v. Peerless Oil & Gas Co.,* 203 Okla. 35, 220 P. 2d 279, the Oklahoma Supreme Court directed Cities Service, a purchaser of gas to take gas ratably from other wells in a given field. From this decision the Commission argues that ratable take statutes do in fact apply to purchasers as well as producers.

It must be noted in the state of Oklahoma the legislature has enacted a *common purchasers' statute,* requiring that purchasers of gas shall purchase and transport natural gas from each person or producer ratably, in proportion to the average production, and prohibits such common purchasers from discriminating in price or amount for like grades of natural gas or facilities as between producers or persons. (52 Okl. St. Ann., § 23.) Also, the legislature of Oklahoma in its conservation of oil and gas *statute* has defined the term "taker" to include a purchaser of natural gas as follows:

"(i) The term 'Taker' shall include any person, who, acting alone, or jointly with any person or persons, is directly or indirectly purchasing or transporting by any means whatsoever or otherwise removing oil or gas from any common source of supply in this State. Laws 1947, p. 326, § 1." (52 Okl. St. Ann., § 86.1.)

It is clear the Kansas Corporation Commission cannot look to the statutes of other states, or to the judicial construction of such statutes, for power to control purchasers of gas in Kansas under the provisions of G. S. 1949, 55-703, as amended.

Both the statute and the Basic Proration Order for the Hugoton Gas Field purport to give the Commission jurisdiction over the regulation of production only. In other words, the "taking" which must be ratable under the statute and the basic order is the *production* of gas from the common source of supply, not the *purchasing* of gas. By a mandatory direction from the legislature the Commission has jurisdiction over production, so that such production will neither be inequitable nor unfair. The "Order" (Case No. 42,128) and the "Rule" promulgated by the Commission (Case No. 42,127) here under review which is directed to purchasers, rather than operators or producers, and seeking to regulate the purchase of gas, or the manner of making such purchases after production has ceased, rather than to regulate the production itself, are in my opinion invalid because they go beyond the jurisdiction conferred upon the Commission by the statute.