45,921

CITIES SERVICE OIL COMPANY, *Appellant,* v. THE STATE CORPORATION COMMISSION OF KANSAS, (Dale E. Saffels, Chairman, Jules V. Doty and John W. Cunningham, as members of said commission and their respective successors in office), *Appellees,* and ASHLAND OIL & REFINING COMPANY, COLORADO INTERSTATE GAS COMPANY, SINCLAIR OIL & GAS COMPANY, PANHANDLE EASTERN PIPE LINE COMPANY and PAN AMERICAN PETROLEUM CORPORATION, *Intervenors-Appellees.*

(483 P. 2d 1123)

Opinion filed April 10, 1970.

*Richard C. Byrd* and *Jack Jones,* of Anderson, Byrd, Richeson & Jones, of Ottawa, argued the cause and *Alfred O. Holl* and *John Lovett,* of Bartlesville, Oklahoma, were with them on the brief for appellant.

*Jack Glaves,* of Topeka, argued the cause and *David J. Berkowitz,* of Topeka, was with him on the brief for the State Corporation Commission, appellee.

*C. C. Linley,* of Liberal, argued the cause and *Wendell J. Doggett,* of Houston, Texas, was with him on the brief for Panhandle Eastern Pipe Line Company, intervenor-appellee.

*Glenn D. Young, Jr.,* of Lilliston, Spradling, Gott, Stallwitz & Hope, of Wichita, argued the cause and *Guy T. Buell* and *Gordon D. Ryan,* of Fort Worth, Texas, were with him on the brief for Pan American Petroleum Corporation, intervenor-appellee.

*Gerald Sawatzky,* of Foulston, Siefkin, Powers & Eberharde, of Wichita, argued the cause and *Stuart R. Carter,* of the same firm, was with him on the briefs for Ashland Oil & Refining Company, and for Sinclair Oil & Gas Company and Colorado Interstate Gas Company, intervenors-appellees.

The opinion of the court was delivered by

FROMME, J.: This is an appeal by Cities Service Oil Company, owner and operator of gas leases in the Kansas Hugoton gas field,

seeking to reverse a judgment of the district court which upheld the order of the State Corporation Commission of Kansas refusing to amend the basic proration order for the gas field.

The basic proration order under attack was originally adopted by the commission in 1944 and production allowables for 3955 wells in this field have since been determined under an "adjusted deliverability formula" set forth in paragraph "L" of that basic order. This "adjusted deliverability formula" was recently discussed in *Cities Service Oil Co. v. State Corporation Commission,* 205 Kan. 655, 472 P. 2d 257. (See page 659.) The background material set forth in that case will be helpful in understanding the questions discussed here. In that case the applicant sought to have the commission amend the basic proration order by substituting what was there referred to as the "reserve index formula" for the "adjusted deliverability formula" to arrive at production allowables on all but minimum allowable wells. The "reserve index formula" was rejected by the commission and the commission's action was upheld on appeal by this court.

The appellant in this proceeding (Cities Service) seeks to have the commission amend paragraph "L" of the basic proration order to provide for special well allowables by adding the following language:

". . . Provided further, that if the current allowable so determined [under the adjusted deliverability formula] for any well will not permit or enable such well to currently produce in proportion to other wells in the field and to ultimately produce the amount of gas underlying the acreage upon which it is located, such well may be granted a special allowable upon application by any interested owner and after notice and hearing upon an order of the Kansas Corporation Commission initiating an investigation on its own motion. . . ."

When the hearing was held before the commission Cities Service and Skelly Oil Company stood in support of the application. Skelly Oil Company has not appealed. The five intervenors who appear here on appeal opposed the application. Much testimony was introduced before the commission on both sides.

Cities Service obtained testimony from its regional engineer based largely upon his study of three gas wells being produced by Cities Service. These wells were referred to as the Barbee "A", the McWilliams "F" and the Mace "A" gas wells. The engineer explained his conclusions by means of graphs on which he had plotted three dotted lines to cover years 1958 through 1967 which showed production allowables for the three wells. The three lines of each

graph depicted in cubic feet of gas (1) the actual total field production allowable for the years included in his study, (2) the production allowable actually assigned to the particular well and (3) the "rateable allowable" which was what the engineer determined to be the fair share of the well's total field allowable. This "rateable allowable" assigned to each of the three wells was considerably above the allowable actually assigned by the commission. The "rateable allowable" in each case followed closely the contour of the upward trend of the total field allowable. From his testimony the commission was able to determine the method and the factors used by him in determining this "rateable allowable".

Much of the testimony of the intervenors challenged the method and factors used by the engineer in arriving at the "rateable allowable" for the three sample wells.

The commission's order denying the application covers seventeen pages of the record. The findings and conclusions of the commission pertinent to a discussion of the points on appeal are as follows:

"FINDINGS OF FACT

. . . . . . . . . . . . .

"2. Paragraph "L" of the Basic Proration Order, as amended, outlines the manner in which individual well allowables shall be determined for any given proration period. Under its provisions a well will get either an adjusted deliverability allowable or a minimum allowable of 50 Mcf per day whichever is greater, there being no provision for any other type allowable.

"3. Except for the minimum allowable amendment adopted in December of 1963, the adjusted deliverability formula has governed the allocation of allowables to the individual wells in the field since April of 1944.

. . . . . . . . . . . . .

"6. Three Cities Service Oil Company wells were cited as examples, being the Barbee, the Mace and the McWilliams wells as illustrated in Exhibits 1, 2 and 3 demonstrating, according to the applicant, that the present formula is not permitting these wells to currently produce proportionately with other wells in the field thus evidencing a need for a special allowable.

"7. Applicant's Exhibits 1, 2 and 3 plot actual allowable curves and ratable allowable curves with considerable difference existing between the two curves over the years exhibited, said difference which the applicant contends constitutes the degree to which the present allocation formula restricts the well to currently produce its proportionate share of the field production.

"8. The validity of the applicant's exhibits 1, 2 and 3 depends on the probative value of the applicant's ratable allowable curves.

"9. In computing the ratable allowance curves, the total field and individual well reserves are used. To calculate such reserves, the pressure decline method to zero pounds abandonment pressure was used. Applicant contends that each well should be assigned allowables wherein it could currently produce

proportionately and annually deplete its reserves at the same rate as the total field depletes its reserves.

"10. Recoverable reserves rather than gas in place should be the standard against which to measure the fairness of an allowable allocation formula. Recoverable reserve determination in this field is made to an abandonment pressure of 25 pounds or more. The abandonment pressures in this field will vary from 25 pounds to 300 pounds depending on the characteristics of the individual well.

"11. The Kansas statutes require that the correlative rights of "developed" leases be protected. "Undeveloped" leases have no correlative rights. The recoverable reserves of any gas unit are measured on the basis of its producing well.

"12. The Barbee "A" No. 2 well is plagued with severe water problems and has a current deliverability of only 21 M. c. f. Since the present allocation formula is currently assigning the well more allowable than it can produce, there has been no unfair allowable allocation treatment of the gas unit. Testimony about a replacement well is speculation.

"13. On the face of things the Mace well with a current deliverability of 1541 M. c. f. and the McWilliams well with a current deliverability of 3376 M. c. f. appear to be getting the allowables to which they are entitled under the field's present allocation formula.

"14. An accurate calculation of the remaining recoverable reserves is essential to the compilation of creditable ratable allowable curves, the applicant having computed its reserves to zero abandonment pressure which is economically unfeasible in the Hugoton Field. This fact weakens the probative value of the special allowable to be assigned a given well.

"15. In computing remaining recoverable reserves it is necessary to consider a well's drainage area and the fact that this may be different from its attributed acreage. It is also necessary to relate the individual well's rate of depletion to those of its offsets. It does not appear that applicant considered these factors in his computation of the reserves used to compute its ratable allowable curves. This omission also weakens the probative value of the ratable allowable curves.

"16. In computing the ratable allowable curves, applicant paid little attention to the over or under production status of the total field or of the example wells. Under existing rules this status can have a considerable bearing on the allowable that a well is entitled to at any given time. Such status was different in each case during the period of years exhibited. This omission further weakened the probative value of applicant's ratable allowable curves.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"20. Applicant did not know how many wells would require or receive a special allowable if the application was granted, no study having been made on this question.

"21. The application shows that if the "suggested" amendment was adopted the total of the special allowables and the total of the minimum allowables would be deducted from the monthly field market demand before the deliverability allowables would be allocated. There is nothing in the record to indicate how much the deliverability allowables would be reduced by such a process—in any one month or in any one year. Nor is there testimony stating that after

such a reduction, the special allowable wells, the minimum allowable wells and the deliverability allowable wells would all be "currently producing proportionately."

"On the other hand there is testimony about the unfairness of the situation under assumed conditions and the unratability of the allowables which could result.

"22. The application shows that if the "suggested" amendment was adopted there would be no guidelines to assist the Commission in determining the size of the special allowable to be assigned a given well.

"23. If applicant's proposal that each special allowable well be permitted to annually produce at the field rate of depletion was adopted, calculations of reserves and of rates of depletion would be required periodically for the field and each well.

"24. If applicant's proposal that each special allowable well be permitted to annually produce at the field's rate of depletion were adopted, the over or under produced status of the special allowable wells would have no effect on its assigned allowable. Under such a system the well which was 14 times January underproduced and the well which was 4 times January overproduced would both get the same special allowable.

"25. The over and under produced status of the approximately 4,000 wells in the field are now in material imbalance. Cities Service Gas Company, with 1,449 connections, is 14 times January underproduced while Northern Natural Gas Company, with 1,130 connections, is more than 3 times January over-produced. The remainder of the field is somewhere in between. The ten purchasers in the field have geographically separated markets and differing demands for gas from the field at any one time. Under the Basic Proration Order and Current Commission Orders wide tolerances in the flexibility of operation are permitted. In this situation "current" means "within a period of several years" and the allowable adjustments which the present formula makes within such a time comply with the statutory mandate that the Commission permit each developed lease to "currently produce proportionately."

"26. The adjusted deliverability formula with its 80% pressure control factor has kept the wellhead shut-in pressures of the approximately 4,000 wells in the field declining reasonably close together. This fact has helped minimize the cognizable uncompensated drainage between offsetting wells.

"27. There has been no showing of cognizable uncompensated drainage away from the three Cities Service example wells.

### "Conclusions of Law

"1. Except for the assignment of minimum allowables, the adjusted deliverability formula has governed the production of gas from the Kansas Hugoton Field for more than 24 years. Its 80% pressure control factor and periodic adjustment of allowables have kept the wellhead shut-in pressures of the approximately 4,000 wells declining reasonably close together. This fact has helped minimize the occurrence of cognizable uncompensated drainage between developed leases. The minimum allowable provision of the Basic Proration Order assures the assignment of a sufficient allowable to permit the economic operation of those wells which can produce it. A continued use of

the present allowable allocation formula will permit each well to ultimately produce the recoverable reserves underlying its attributed acreage and to currently produce proportionately with the other wells in the field without cognizable, uncompensated drainage.

"2. There are at least two things wrong with applicant's ratable allowable curves.

"First, the entire premise is incorrect. Under existing rules and most circumstances there is no reason why the individual well's annual rate of depletion should coincide with that of the total field. On the contrary, there are many reasons why the two rates of depletion shouldn't coincide.

"Second, assuming for the sake of argument that the premise was correct and the two rates of depletion should be identical,—accurate remaining recoverable reserve determinations are essential to a fair calculation of the respective rates of depletion. The reserves which applicant used for the computation of his ratable allowable curves are inaccurate.

"Under existing rules, with the flexibility of operation tolerances up to 15 times January for underproduction and 6 times January for overproduction, and with substantial under and overproduction imbalance now existing among the 4,000 wells in the field, coupled with the field's unproduced reinstated cancelled underage situation with an allocation formula which periodically adjusts allowables to compensate for production imbalance it would be inequitable to hold annual well depletion rates to that of the total field.

"Under present rules a seriously underproduced well is and should be permitted to deplete its reserves faster than does the total field—so that it can begin to catch up. The contrary is true for a severely overproduced well.

"Moreover, applicant made reserve determinations which (1) went to zero pounds abandonment pressure, (2) ignored the differences in the over and underproduction—of the individual wells—of their offsets—and of the total field, (3) assumed that each well's drainage area coincides with its attributed acreage, and (4) ignored the development histories of the studied well and of its offsets. We must conclude that the factors used to compute applicant's ratable allowable curves are unreliable.

"For the reasons above stated we conclude that applicant's ratable allowable curves have no probative value.

"3. The applicant has not shown a need to amend the Basic Proration Order so as to provide for the assignment of special allowables.

"4. The application should be denied."

.    .    .    .    .    .    .    .    .    .    .    .    .

The position of Cities Service is that the basic proration order for the Hugoton gas field is unlawful in that it fails to comply with the requirements of K. S. A. 55-703.

The statute authorizes the commission to restrict the rate of gas production whenever the market demand from a field is less than the productive capacity of the wells located therein—a situation which admittedly has existed in the Hugoton gas field over an extended period of time. However, this statutory restriction placed

upon the producers prevents the free operation of the rule of capture and necessitates a guarantee of protections provided in the statute. The protections provided in the statute read:

". . . [T]hen any person, firm or corporation having the right to produce natural gas therefrom, may produce only such portion of all natural gas that may be currently produced without waste and to satisfy the market demands, as will permit each developed lease to ultimately produce approximately the amount of gas underlying such developed lease and currently produce proportionately with other developed leases in said common source of supply without uncompensated cognizable drainage between separately-owned developed leases or parts thereof." (K. S. A. 55-703)

Cities Service contends the basic proration order for the Hugoton gas field deprives it of the following protections set forth in this statute, (1) the right to produce currently and proportionately with other developed leases in the field and (2) the right to ultimately produce approximately the amount of gas underlying its leases.

The legislature in authorizing the commission to prorate production allowables in the field specified certain factors which should be given consideration. The statute further provides:

". . . In promulgating rules, regulations and formulas, to attain such results the commission shall give equitable consideration to acreage, pressure, open flow, porosity, permebility [sic] and thickness of pay, and such other factors, conditions and circumstances as may exist in the common source of supply under consideration at the time, as may be pertinent: . . ." (K. S. A. 55-703)

The strength of the testimony on which Cities Service based its claim, that the basic proration order of the commission was unlawful, was dependent upon the method and factors used by the engineer in arriving at the "rateable allowables" which he assigned to the three sample wells. Failure to consider the statutory and equitable factors which pertain to the Hugoton gas field as a common source of supply necessarily weakens the probative value of the "rateable allowables" assigned by the witness to the sample wells.

The evidence in the record adequately supports the commission's findings that the method used by Cities Service to arrive at the sample "rateable allowables" failed to consider several important factors which should be reflected in any proration formula. Those overlooked factors were the variances in abandonment pressure in the field, the differing drainage area of the wells, the production imbalance of the wells and the development histories of the studied well and its offsets. (See commission's findings of fact and conclusions of law set forth herein.)

The history of litigation in this state over this basic proration order for the Hugoton gas field has been long and colorful. It spans a period of over thirty years.

In *Hayward v. State Corporation Comm.*, 151 Kan. 1008, 101 P. 2d 1041, it was determined that the basic order was merely a formula to arrive at the allowables and not self-executing. The commission alone has the authority and the responsibility not only to promulgate the order but also to perform those administrative acts necessary to arrive at the schedule of allowables. Until a schedule is set up, the courts have no right to interfere by injunction with those administrative functions of the commission.

In *Aylward Production Corp. v. Corporation Commission*, 162 Kan. 428, 176 P. 2d 861, it was determined the commission had the power to amend the basic proration order and to fix a minimum allowable.

The basic proration order was again examined in *White Eagle Oil Co. v. State Corporation Comm.*, 168 Kan. 548, 214 P. 2d 337, and the question of unitizing noncontiguous acreage was considered.

In *Northern Natural Gas Co. v. Republic Natural Gas Co.*, 172 Kan. 450, 241 P. 2d 708, the provisions of the basic proration order were examined and the restrictions against over production were enforced.

In *Republic Natural Gas Co. v. State Corporation Commission*, 173 Kan. 172, 244 P. 2d 1196 an order of the commission cancelling under produced production allowables was held to be in compliance with the provisions of the statute and the basic order.

In *Stevens v. State Corporation Commission*, 185 Kan. 190, 341 P. 2d 1021, it was held the provisions of the general order controlled the production and conservation of gas from the Hugoton field. It was further held to be unlawful and unreasonable for the commission to issue special orders in individual cases contrary to the provisions of the general order without amendment thereof.

The subject of production allowables in the Hugoton gas field was explored in *Colorado Interstate Gas Co. v. State Corporation Comm.*, 192 Kan. 1, 386 P. 2d 266. Production allowables for portions of 1958 and 1959, which had been set by the commission using the "adjusted deliverability" formula were approved. It was determined that the orders setting the allowables did not violate the provisions of G. S. 1961 Supp. (now K. S. A.) 55-703, or the commission's basic order.

In the companion case of *Colorado Interstate Gas Co. v. State*

*Corporation Comm.,* 192 Kan. 29, 386 P. 2d 288, it was held that the authority granted by G. S. 1961 Supp. (now K. S. A.) 55-703 is not an unconstitutional delegation of legislative authority, and is not in violation of the due process and equal protection clauses of the federal and state constitutions.

In *Cities Service Oil Co. v. State Corporation Commission,* supra, after examining the basic proration order which included the "adjusted deliverability formula", we said:

"The commission's order is substantially supported by evidence. The commission has taken into account the various factors it is required to consider under 55-703 and we think its order represents a reasonable and practical effort to handle a difficult problem in compliance with the legislative mandate." (205 Kan. 655 at p. 669.)

In the present case there was testimony that production from each of the three sample wells was affected by individual characteristics or problems which had arisen by reason of their location in the field or the size of casing used in bringing the wells into production. One well was a minimum allowable well located near the perimeter of the field, producing from a narrow pay zone which could not be satisfactorily fractured because of its proximity to water. The other two wells had been equipped with 5½ inch casing. One could not be fractured and the other had been fractured with only limited results.

In *Cities Service Oil Co. v. State Corporation Commission,* supra, we pointed out:

". . . The commission can do nothing to change the natural excellence of any particular tract in the field; it can only provide each a fair opportunity to produce its share." (205 Kan. 655 at p. 667.)

In *Colorado Interstate Gas Co. v. State Corporation Comm.,* supra it was said:

"The Commission cannot require or guarantee that each well owner will produce and sell his entire allowable. The Commission is required to afford each owner the 'right or opportunity' to produce his share. As far as the Commission's duty under the basic order goes, it is fulfilled when each owner is legally 'free to produce' and not denied the 'right or opportunity' to produce his allowable." (192 Kan. 1 at p. 25.)

The intervenors strenuously resist the amendment proposed by Cities Service on the ground no guidelines are provided in the amendment to limit the extent and scope of future applications for special allowables. They argue the amendment would result in a myriad of applications to set special allowables for all wells in

the Hugoton gas field. The effect of such an amendment would be unpredictable. The commission saw merit in this argument.

Cities Service presents the argument that the denial of its application to amend the basic proration order deprives it of due process of law. It reasons that until the basic proration order is amended to permit special allowables it has no adequate remedy at law to obtain special allowables on wells which have not been permitted to currently produce in proportion to other wells in the field and to ultimately produce the amount of gas underlying the acreage.

The argument is not convincing for two reasons.

In the first place it assumes that the "deliverability formula" in the basic proration order does not conform to K. S. A. 55-703. We have only to look at the previous cases decided by this court, including the most recent case of *Cities Service Oil Co. v. State Corporation Commission,* supra, to see that this court, under varying facts and circumstances, has repeatedly approved the basic order as complying with the statute. Therefore, the burden in this case rested upon the applicant. The commission is not required to amend the basic order to cover hypothetical situations which might arise in the future. It is not a violation of due process to refuse to amend the order until an actual need for the amendment is proven and reasonable guidelines to define the scope of the change are established.

In the second place Cities Service has again been given every opportunity to present its case in an effort to show a need for changing the basic order and it will continue to have that right in the future. Its difficulty is not because of lack of a remedy. It has failed because of lack of proof. Due process does not require that a litigant win but only requires that it be given ample opportunity to prove its case.

The right of the owner or lessee of land in and to the oil and gas beneath the surface is not an absolute one. (*Republic National Gas Co. v. State Corporation Commission,* supra, *State Corporation Commission of Kansas v. Wall,* 113 F. 2d 877 [1940]) The limitations placed by proration statutes upon the right of the owner and lessee of land to produce oil and gas beneath the surface do not *per se* deprive the owner or lessee of property without due process of law. (*Colorado Interstate Gas Co. v. State Corporation Comm.,* supra.)

Although we have not specifically addressed ourselves to each of the thirteen points relied on by the appellant we have considered

them in the light of the record before us. After a careful review of the action of the commission in refusing to amend the basic proration order for the Kansas Hugoton gas field we hold the trial court properly affirmed the order of the commission denying appellant's application.

The judgment is affirmed.